[Crim. No. 293.   Second Appellate District.—December 17, 1913.]

THE PEOPLE, Respondent, v. QUAN GIM GOW, Appellant.

CRIMINAL LAW—CONFESSION OBTAINED BY POLICE OFFICERS—WHEN NOT VOLUNTARY.—Where police officers procure a confession from a Chinaman by persistent questioning when he is apparently frightened and unwilling to answer after having been arrested for murder, there being present with him no interpreter or any person of his own nationality through whom he may clearly make known his disinclination to speak, or express understandingly any explanations which he may desire to give, the confession is involuntary, though no physical force is used and no threats or promises are made.

ID.—PARTICIPATION OF POLICE OFFICERS IN PROCURING CONFESSION AS SHOWING ITS INVOLUNTARY CHARACTER.—The fact that the questioning was done by police officers presents an important item for consideration in determining whether the admissions extracted were of a voluntary character.

ID.—ERROR IN ADMITTING CONFESSION IN EVIDENCE—WHEN PREJUDICIAL.—The admission of such confession in evidence in a prosecution for murder to prove that the defendant, who made it, fired the fatal shot, is reversible error where the case as presented to the jury, without the confession, is such as might leave the jury in doubt as to whether the defendant committed the crime.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Paul J. McCormick, Judge.

The facts are stated in the opinion of the court.

Davis & Rush, for Appellant.

U. S. Webb, Attorney-General, and George Beebe, Deputy Attorney-General, for Respondent.

JAMES, J.—Appellant herein was convicted of the crime of murder in the second degree. He appeals from the judgment and from an order denying his motion for a new trial.

The deceased was one of the proprietors of a store located in that portion of the city of Los Angeles called Chinatown. On the twenty-fifth day of May, 1912, appellant entered this store. The room was divided into two compartments, the one nearest the street being utilized for the sale of merchandise, while a curtained room in the rear was used for gambling purposes. It was in this rear room that the shots were fired which killed Chin Hoy Hing. The witnesses who furnished the testimony as to what occurred in the two rooms were Chinese and none of them testified to having seen the defendant fire the fatal shot. One of these witnesses testified that he sat in the outer room as a lookout to warn the gamesters of the approach of officers; that he did not see the defendant go into the gambling room, but saw him come out after having heard some shots fired; that the defendant ran out into the street, fired a shot at the building and then threw his gun away, when he proceeded up the street until he met the officers who arrested him. Two other Chinese, who were partners of the deceased, testified that they were in the gambling room when the shots were fired, but that they did not see who fired them. These witnesses were introduced on behalf of the prosecution. Four witnesses of the same nationality as those who preceded them on the witness-stand testified on behalf of the defendant, and they told a story generally to the effect that after the shooting occurred two men came out of the store with pistols in their hands and ran away, and that the defendant came out after them.

The defendant's own testimony was to the effect that he entered the store intending to gamble, but had stopped at the counter in the outer room, when the shooting occurred in the gambling compartment and two men came hurrying from the rear room past him; that as they did so they jostled him and that he pulled his revolver and fired a shot which lodged in the wall above the counter; that he then ran out after the men and fired another shot as he got into the middle of the street, then threw his gun away and again ran. The surgeon who performed the post-mortem examination on the body of deceased testified that he found two bullets embedded in the body, both being of 38 caliber, one, however, being what is called "long" and the other "short." One of the police officers at the trial testified that all of the empty shells found in the revolver which the defendant threw away in the street were "38 long." This brief resumé of the evidence shows that the case as presented to the jury, leaving out of consideration the testimony as to an alleged confession made by the defendant, was one which might well have left the jury in doubt as to whether the defendant had actually fired the shots which killed the Chinese storekeeper.

Testimony of an alleged confession made by the defendant soon after his arrest was furnished by several police officers. One of these witnesses was the arresting officer, who testified that on the day of the arrest defendant was taken into the detectives' office at the police station in Los Angeles and, in the presence of several officers, interrogated as to the killing of Chin Hoy Hing. It is the earnest contention of counsel for appellant that the trial judge erred in admitting this testimony, for the reason that the statement of the defendant as represented to have been there made was not free and voluntary. In order to fully illustrate the conditions as they then surrounded the defendant, it will be well to quote from the narrative of the testimony of the arresting officer, as it appears in the transcript. The following quotations are not made in continuous sequence, but those interrogatories and the answers made thereto which refer to the matters in point are given:

"(Cross-examination.) Q. Now, when the defendant was first interrogated, he didn't want to answer, did he? A. He did not. Q. And he didn't—he hung his head and refused

to answer for some time? A. Didn't say anything for quite a while. Q. And it was only after persistent questioning that you finally obtained—succeeded in obtaining any answers at all? A. After we questioned him for possibly five or ten minutes. Q. When you got the defendant in there, did he have any other—was there any other Chinamen present? A. No, sir. Q. Any friend of his? A. No sir. Q. Any attorney? A. No sir. Q. No one at all to represent him? A. No sir. Q. And you officers that gathered about there and questioned him for some time before he would answer at all? A. Yes sir. Q. But eventually you got him started to answer? A. Yes. Q. When you got him started to talk, you kept him at it? ' A. Yes; generally kept it up. He went right ahead and talked. Q. All you knew was that he had refused to talk to you for some time A. He had. Q. Refused to say a word? A. He did. A. Officer Browning asked him why did you shoot this man, or why did you shoot at him. He asked that a number of times before he would answer; possibly five or ten minutes he kept asking him that question, and he also asked what tong he belonged to, where he came from, what tong the other man belonged to. That is nearly everything that was said at that time. Q. Now, I will ask you if it is not a fact that when these questions had been asked of him many times, you were satisfied that he didn't want to answer, but that you didn't give up hope? A. Well, we just thought eventually that he would talk; he kept fidgeting around in his chair, looked like he wanted to say something, but was afraid. Q. So, he refused to answer at first, and not to give up, you kept on asking him until he finally answered? A. Yes. Q. And the defendant appeared to be fidgeting and squirming around in his chair as though he was afraid to answer? A. I though he wanted to do so, but he didn't know whether he better or not. Q. You don't know whether it was because he was afraid to answer or afraid not to answer, when he was squirming around in his chair, do you? A. I do not know. Q. Did he appear to be afraid? A. Outside of squirming in his chair, he didn't. Just calm and cool.'' The Officer Browning referred to by this witness testified that he did not instruct the defendant that he need not answer questions, or that the answers he might make would be used against him. The statement finally admitted

in evidence as having been given by the defendant was to the effect that when asked why he killed the Chinaman, he said that he had gone into the place of the deceased to gamble, that he had lost four dollars, and that the man who had been killed shot at him two times, and that he shot in return four or five times; that he had come to San Francisco a day or two previous to the day upon which the shooting occurred. Was the statement of the defendant shown to have been voluntarily made? If not, then no evidence of it was entitled to have been given to the jury. The defendant, a Chinaman, was brought, while under arrest, alone, and unaccompanied by friends or counsel, into the office of the detectives and there subjected to a vigorous oral examination. At first he refused to answer any questions and his silence continued, for from five to ten minutes. The questions were persisted in; the same interrogatory designed to draw from him the admission that he had fired the shot that killed Chin Hoy Hing, was repeated many times. At one point he said he did not "savey" or understand. He fidgeted and squirmed in his chair and appeared afraid of something. Finally he gave the statement set forth in the foregoing. It seems quite clear from the evidence of the conditions which surrounded the defendant at that time that he did not desire to make a statement. While no physical force was used and neither threats nor promises made, there can be no doubt at all but that the repeated questioning of the officers, like the constant dropping of water upon a rock, finally wore through his mental resolution to remain silent. Admittedly, his refusal at first to answer incriminating questions gave evidence of a desire to make no statement. When did this unwillingness vanish and a desire to talk succeed it? Not after he had been given any period of time for reflection, for his inquisitors allowed him none. The examination was persisted in until a response was forthcoming, and under these circumstances it must be said that the responses appear to have been unwillingly made and as a direct result of continued importuning. This case does not present an instance of as flagrant a disregard of an accused's constitutional right not to be compelled to furnish self-accusing evidence, as is illustrated by the cases of *People* v. *Loper,* 159 Cal. 6, [Ann. Cas. 1912B, 1193, 112 Pac. 720], and *People* v. *Borello,* 161 Cal. 367, [37 L. R. A.

(N. S.) 434, 119 Pac. 500], but what is said in those decisions touching the general subject here considered is pertinent and applicable. The fact that the questioning was done by police officers presents an important item for consideration in determining whether the admissions extracted were of a voluntary character. As is said in *Bram* v. *United States,* 168 U. S. 557, [42 L. Ed. 568, 18 Sup. Ct. Rep. 192] ; "Whatever be the rule in this regard in England, however, it is certain that where a confession is elicited by the questions of a policeman, the fact of its having been so obtained it is conceded may be an important element in determining whether the answers of the prisoner were voluntary. The attempt on the part of a police officer to obtain a confession by interrogating has been often reproved by the English courts as approaching dangerously near to a violation of the rule protecting the accused from being compelled to testify against himself." As has been adverted to, in this case, there was not only the presence of more than one police officer, but each engaged in queestioning the defendant, who was apparently frightened and who was not furnished the aid of an interpreter or any person of his own nationality through whom he might make clearly known his disinclination to speak, or express understandingly any explanations which he might have desired to give. The attorney-general argues that the statement of the defendant was not in fact a confession of guilt, and that therefore the prosecution was entitled to introduce evidence of it without any preliminary showing as to its voluntary character. The evidence was offered to prove an important incriminating fact, to wit; that the defendant had fired the fatal shot. The decision in *Bram* v. *United States,* 168 U. S. 557, [42 L. Ed. 568, 18 Sup. Ct. Rep. 192], cited and approved in the California cases above mentioned, contains this expression: "It is also clear that in determining whether the proper foundation was laid for its admission, we are not concerned with how far the confession tended to prove guilt. Having been offered as a confession and being admissible only because of that fact, a consideration of the measure of proof which resulted from it does not arise in its admissibility." In the case of *People* v. *Wilkins,* 158 Cal. 530, [111 Pac. 612], cited by respondent, the statements which were held not to amount to a confession contained no admission as to the principal

incriminating facts; there the defendant denied that he had been instrumental in the killing. The error of the court in admitting the confession, under the circumstances shown here, was highly prejudicial.

The instructions of the trial judge given to the jury were quite complete in their statement of the law as applicable to the charge upon which defendant was tried and to the evidence introduced under it. It was not error for the court to advise the jury that all persons concerned in the commission of a felony might be prosecuted as principals, and no new theory was thereby injected into the case. Under the evidence the jury had the right, if it so believed, to determine that the defendant committed the crime in conjunction with other persons. While it is shown that the court refused certain instructions offered by appellant, it appears also that the matters which they embraced were covered sufficiently in the charge as given.

Because of the error first considered, the judgment and order are reversed.

Conrey, P. J., and Shaw, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 13, 1914.