[Crim. No. 2832. In Bank.—April 14, 1926.]

## THE PEOPLE, Respondent, v. WILLIE ADAMS and ALFONSE RINCON, Appellants.

**[1]** CRIMINAL LAW — MURDER — SUFFICIENCY OF EVIDENCE. — In this prosecution for murder it is held that the proof of the guilt of the defendants was conclusively shown at the trial.

**[2]** ID.—CONSPIRACY—INSTRUCTIONS.—In this prosecution for murder it is held that under the evidence it was the court's duty to instruct the jury as to the law of conspiracy and that the instructions given thereon were correct.

**[3]** ID.—PENALTY—DISCRETION OF JURY—INSTRUCTIONS.—In a prosecution for murder, an instruction to the jury in effect that the exercise of their discretion in determining whether the death penalty or imprisonment for life should be imposed was substantially absolute, and that they were free to return a verdict carrying with it imprisonment for life, rather than infliction of the death penalty, and that the infliction of either penalty was a question submitted solely to their sound judgment and discretion, did not limit the right of the jury in the exercise of their discretion.

**[4]** ID.—COMPELLING DEFENDANT TO VISIT SCENE OF CRIME—LACK OF PREJUDICE.—In a prosecution for murder, there was no prejudicial error in the prosecution compelling the defendants to revisit the scene of the crime, where the defendant complaining of this action denied statements by the other defendant incriminating him and

----

3.  See 13 Cal. Jur. 744; 8 R. C. L. 258.

he at no time made any confession of guilt. His appearance under the stress of such a situation had no special significance.

[5] ID. — STATEMENTS AND ADMISSIONS — EVIDENCE. — Any statement made by a defendant not amounting to a confession is admissible against him without preliminary proof of the fact that it was freely and voluntarily made. The distinction between a statement or admission of fact and a confession of guilt is well settled.

---

(1) 30 C. J., p. 312, n. 42.   (2) 30 C. J., p. 395, n. 14.   (3) 30 C. J., p. 425, n. 87.   (4) 30 C. J., p. 442, n. 48 New.   (5) 1 C. J., p. 1363, n. 8; 16 C. J., p. 629, n. 21, p. 715, n. 3, 4, 7, p. 717, n. 39.

APPEAL from a judgment of the Superior Court of Los Angeles County. Arthur Keetch, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. T. Aggeler, Public Defender, Franklin Padan and G. A. Benedict, Deputy Public Defenders, for Appellant Adams, and H. M. Dalton for Appellant Rincon.

U. S. Webb, Attorney-General, and Erwin W. Widney and John W. Maltman, Deputies Attorney-General, for Respondent.

SEAWELL, J.—The defendants, Willie Adams and Alfonse Rincon, were accused by the district attorney of the county of Los Angeles, by an information filed in the superior court of said county of Los Angeles against them, with the crime of having, on or about the seventeenth day of May, 1925, in said county of Los Angeles, murdered one T. K. Ullman. The trial resulted in the jury finding each defendant guilty, by separate verdict, for murder in the first degree, which verdicts, under the law, carried with them the imposition of the death penalty. A death judgment was accordingly pronounced by the court against the said defendants. At the trial they were represented by separate counsel and each appealed from the judgment imposing the death penalty and from the order denying the motion made by each for a new trial. Both defendants are from Mexican ancestry. Rincon is a native of this state and was past twenty-six years of age at the time of the commission of the

5.  See 8 Cal. Jur. 98; 1 R. C. L. 472.

crime of which he stands convicted. As a youth he attended the grammar and high schools of the city of Los Angeles. Adams was past twenty-two years of age, a native of Mexico, but had been a resident of this state since he was of the age of about twelve years.

[1] The proof of the guilt of the defendants was conclusively shown at the trial and there is no reasonable ground to sustain the claim that either should have escaped the consequences of an exceptionally cruel murder. Briefly told, the circumstances are that the deceased, T. K. Ullman, aged about fifty-eight years, lived alone in a sparsely settled community near Elizabeth Lake, situate in the northern portion of the county of Los Angeles, and approximately sixty-five or seventy miles from the city of Los Angeles. The entrance to Ullman's lands was by way of a by-road leading from the Elizabeth Lake and Palmdale public road. He was the owner of a number of acres of land, upon which he resided, and in connection with his ranch interests he conducted a blacksmith-shop and performed such occasional service as came his way. He was crippled in both limbs and walked with considerable difficulty. The few persons living in the general locality were widely separated by great distances. The view from one neighbor's home to another was obstructed by intervening hills. Defendant Willie Adams, who seems to have had no fixed place of abode, had for a period of about two years worked in turn for the several ranchers in the neighborhood, including the deceased. At the time of the murder he was cultivating, or had been cultivating, a small vegetable garden on Ullman's property upon shares, but his most recent employment was by Mr. R. L. McDaniels, whose connection with the defendants will hereafter appear. Defendant Rincon resided in the city of Los Angeles with his sister and her husband, Mr. and Mrs. McDaniels. He had part-week employment at a Los Angeles daily newspaper. In January, 1925, Mr. McDaniels seems to have made an entry upon lands lying contiguous to the lands of Ullman, claiming the same to be public lands and subject to entry by virtue of the homestead laws of the various acts of Congress. There was no convenient way of ingress or egress into or from said lands except over the lands of Ullman, and said homestead lands were without a water supply. McDaniels claimed that an old, unoccupied house

supposedly upon the Ullman lands was in fact upon his homestead, and he proceeded to occupy the same. McDaniels erected no buildings upon his homestead. He carried with him to said entry a tent, in which he expected to live, and two spring bed mattresses, two or three chairs, a cooking stove and a few other articles of lesser importance, none of which was of any considerable value. In addition to taking possession of the unoccupied house upon Ullman's lands, McDaniels also disputed the property lines as previously fixed by Ullman and claimed the right to travel across and upon lands supposedly owned by Ullman. Bitter feelings of hostility were engendered between McDaniels and Ullman. Adams was in pronounced sympathy with his employer and shared with him his feelings of ill will for Ullman. The disputes between Ullman and McDaniels were halted upon Ullman causing McDaniels' arrest upon a complaint charging him with trespass. McDaniels returned to his home at Los Angeles almost immediately following his arrest, and upon the second day after reaching home he suffered a heart attack, which resulted in his sudden death. During the controversies between McDaniels and Ullman as to property lines and the right of McDaniels to travel upon Ullman's lands, Adams was quite self-assertive, and upon one occasion, at least, when registering a complaint against Ullman for refusing to allow McDaniels to cross his lands for the purpose of bringing water to the homestead, remarked that he would kill "that Dutchman." Adams admitted that he made the remark attributed to him, but claimed that it was made in a light vein and in a joking mood. Other witnesses testified to threats made by him against the life of Ullman upon other occasions. The defendant Rincon had been upon the McDaniels' claim but once prior to the latter's death, and while there made the acquaintance of Adams. It was on or about May 12th that Rincon, after a number of visits from Adams, concluded to visit the McDaniels' claim for the asserted purpose of caring for a hay crop and gathering up the personal effects belonging to McDaniels. Accordingly, he went from Los Angeles to the McDaniels' homestead with Adams and was constantly in his company to the day following the commission of the crime. Both occupied, without the consent of the owner, the house of a neighbor who was temporarily absent.

Both were seen on the day before and on the morning of the day the crime was committed, at or near Ullman's house. It was made certain by the evidence that both were reduced in circumstances. Rincon had attempted to sell a rifle, belonging to McDaniels, to a neighbor, but failed. They were without provisions and tobacco and were unable to purchase either in any substantial quantities. Ullman, it seems, kept on hand a small supply of cigarettes and a tin or two containing small cigars. He also had in his house a small money safe, the outer door of which was fastened by a combination lock and the inner door was locked by key. On the day of the murder he had something like seven dollars in coin and currency in his purse and he also had in his pocket the key which unlocked the inner safe door and the key which fitted the Ford automobile lock. The automobile was equipped with a delivery bed and top. Upon reconnoitering the locality and selecting an opportune time, which chanced to be the hour of about 3 o'clock in the afternoon, the defendants entered the home of Ullman, who was seated in a rocking chair, evidently enjoying the entertainment furnished by his radio. Either Adams or Rincon informed Ullman that he wished to buy cigarettes, and as Ullman arose from his chair to receive the twenty-five cents handed to him by the purchaser, and was in the act of putting it into his purse, the other struck him upon the back of the head from behind with an iron bar, which the defendants had carefully selected from a scrap-pile of old iron which was near to or in Ullman's blacksmith-shop. The first blow felled him to the floor, and as he lay there he was struck two successive blows, one on each side of the head in the region of the temples. No sound save a groan of pain escaped the old man's lips and death probably ensued very soon after he received the mortal blows. The body was searched by the defendants and the keys and what money his purse contained, amounting to about six dollars, were taken, while a silver dollar and some small coins, which doubtless fell from his purse to the floor, were overlooked by the defendants. The house was thoroughly searched by the defendants for plunder and it was left in a condition of disorder by them. Both defendants admitted at the trial, and upon other occasions, that they carried the body from the room in which the deceased was killed to the

open well containing water, a distance greater than fifty feet, and deposited it in the well and filled the space between the water and the level of the earth with broken boxes and debris. They repaired to the shed or barn, where the Ford machine was kept, took possession of it and made their way to Los Angeles, stopping at a friend's house before arriving at the home of Mrs. McDaniels, where they remained that night and until late on the following afternoon, which was Monday, May 18th. The plate containing the number of the stolen machine was removed and the plate under which the McDaniels' machine was operated substituted in its stead. The top of the Ford car was also removed and other changes calculated to disguise the identity of the machine were made. In the afternoon of that day— Monday—defendant Adams and two Mexican women started to the locality in which Ullman had been murdered. Adams claimed that he had interested the two women in the purchase of the McDaniels' furniture and he was taking them to the place where he and Rincon had left the furniture, that they might inspect the same. In the meantime the discovery of Ullman's body had been made by neighbors, and the blood-bespattered room in which he had been murdered and other evidences of the gruesome deed pointed to murder. Adams and Rincon were strongly suspected of the crime, and it was the understanding among the neighbors that should either be found in the neighborhood the person so finding them should detain them for investigation as to their knowledge of the crime. At dusk on the afternoon of Monday, May 18th, Adams arrived at the residence of one of Ullman's neighbors in company with the two women above referred to. The neighbor informed Adams of the discovery of Ullman's body and told him that the neighborhood suspected him and Rincon as the persons who had murdered Ullman. He told him that he had instructions to arrest him and take him to a neighbor's residence for examination. Adams expressed a willingness to go, and told the neighbor to go into the house and put on his coat and prepare himself to accompany him and he would drive him to said neighbor's residence. As the neighbor entered his house to prepare for the journey Adams hurried to where the automobile was standing, leaped into it and started away at a high rate of speed. The neighbor, upon discovering

that he had fled, mounted a horse and followed as rapidly as he could. Upon reaching the main highway, Adams, in his attempt to turn into it, overturned the machine he was driving, and the two women riding with him were thrown clear of the machine, but he was pinioned beneath it. He was held there until the arrival of several neighbors, who released him from his position and took him into custody. That night he was taken to a neighbor's and, in the presence of several persons, made a statement as to his and Rincon's participation in the murder. He stated that they had committed it for the purpose of robbery. A blood-stained one-dollar bill and other coins which had been taken from Ullman's body were upon his person. He related with much detail the plan of execution of the crime and directed the officers to another well, into which he and Rincon had deposited the clothing which they wore at the time they committed the crime. The clothing, blood-stained, was, according to description, recovered. He gave other information, which, upon investigation, was verified by indisputable physical facts. The discovery and rescue of Ullman's body from the well was followed by disclosures which cast suspicion upon Adams and Rincon. The reports of the discoveries quickly spread to the city of Los Angeles, and on the same afternoon one of the local papers carried a story of the murder. A friend of Rincon's, upon reading the article, hastened to the McDaniels' home to inform him of the report that was upon the streets. Rincon became very much alarmed, and, after a consultation with his sister and one or two friends, proceeded to a Los Angeles newspaper office and made a statement denying any participation in the murder of Ullman. This was the first information given out by Rincon to any person concerning the tragedy, with the possible exception of informing his sister that Ullman had been killed. He made no report of Ullman's death to any officer of the law. He was taken into custody the following morning.

A short time after Adams made his first statement of his and Rincon's connection with the crime he made a second statement, in which he implicated Mrs. McDaniels and another person, whom he claimed were at the scene of the murder and were active participants therein. He excused himself of any participation whatsoever in the murder and

stated that he had no knowledge that Ullman was to be killed. His claim was that after Ullman had been slain by Rincon he was forced by the latter's threats to take his life if he should refuse to assist in carrying the body to the well, and he was acting under the influence of fear when he assisted in making a search of the house for money and valuable property, and thereafter, while driving the automobile into Los Angeles. In fact, he insisted that everything he did from the moment of Ullman's death to the time when he left the McDaniels' home on Monday, May 18th, was done under pressure of fear and threats. He afterward abandoned the portion of his story which incriminated the two persons whom he had falsely accused, but clung to that portion of his story in which he claimed that he acted under a sense of fear alone when he did the things which appeared to connect him with the crime. According to a subsequently revised story Rincon was declared to be the sole person who coerced and intimidated him by threats of violence to do everything done by him which had an inculpatory aspect. Rincon, on the other hand, excused himself and accused Adams. Both of the defendants made a number of statements in which they described in detail the manner in which the crime was executed. In this respect there is no material difference between their statements. The manner of the execution of the crime as told by each is fully corroborated by physical facts. The only difference between the stories of the defendants is that each claimed that the other committed the crime in precisely the same manner as described by each and under the pressure of threats made by the other. Each incriminatory statement charged by one as having been made by the other was turned by the one accused as the statement of the accuser. We have carefully examined the record in this case, which consists of more than one thousand typewritten pages, and are convinced by our examination of the record, as the jury must have been convinced by the statements made by the defendants themselves and by the testimony of numerous witnesses and corroborating circumstances, that there is no possible theory upon which either of the defendants can be innocent of the crime charged against them. It is not our purpose to enter into a discussion of the weight, effect or conclusiveness of the evidence. It is so overwhelming in

its convincing force to the effect that the two acted in concert as to sweep away the feeble efforts made by each of the defendants to relieve himself of the consequences of a brutal, deliberately planned murder. The motive on the part of each was twofold. There can be no doubt but that Mrs. McDaniels, the sister of Rincon, and Rincon himself, absorbed much of the bitterness of feeling that McDaniels held for Ullman as a result of the disputes which arose out of the asserted right of McDaniels to travel the Ulman lands. Neither can there be any doubt but that Rincon felt that the heart attack which resulted in the sudden death of his sister's husband was attributed directly to the excitement produced by Ullman in procuring McDaniels' arrest. There is no doubt but that Adams, who had worked for McDaniels, and who had become a partisan in the disputes which arose between McDaniels and Ullman, was hostile to the latter, as his declarations and conduct plainly indicated. So much for malice on the part of the defendants. That they were also moved to the commission of the murder by a desire to possess Ullman's property is proved by the fact that they actually looted and plundered his home. The six dollars taken from the person of the deceased and the larceny of the automobile and some other articles is cumulative upon the issue. So far as overt acts would indicate, Adams was the bolder and more abandoned of the two. But that they acted in concert and jointly executed the crime there seems to be no room for reasonable doubt. Both had been in the immediate vicinity of Ullman's house for some five or six days prior to the commission of the crime and no legitimate business seems to have required the presence of either in that locality. They were constantly together, acting in all matters in apparent unity and accord, and both entertained a hostile feeling against Ullman. The claim made by each that the other struck the fatal blow, and the further claim as to the robbery of the house and the theft of the automobile and the concealment of the body and the prior and subsequent conduct of the defendants were questions for the jury's consideration in determining the part taken by each of the defendants in the commission of the crime and their relation thereto. The jury by its general verdict impliedly found against the defendants on every material issue ad-

vanced by them. The verdict is unquestionably sustained by the evidence.

[2]  The questions of law presented for our consideration are few and simple. The court instructed the jury as to what acts are necessary to be established in order to constitute a person an accomplice with another in the commission of a crime. It is admitted that the instructions given on the subject are academically correct and not subject to just criticism, but it is urged that such instructions were not applicable to the facts of the case and the recitation of the law of conspiracy prejudicially affected the jury in its consideration of the defendants' cause. This contention is wholly without merit. The facts as herein related are a complete answer to the contention that the evidence was insufficient to support the theory, or to justify a conviction of the defendants, upon the basis that they were co-conspirators in the commission of the crime. The court would have fallen short of performing its full duty had it refused to instruct the jury as to the law of conspiracy. The instructions given by the court upon this issue, as well as upon all the issues presented, are exceptionally full, fair and free from error. Every phase of the law was fully covered and the defendants suffered no prejudice in any single particular by the court's instructions. They certainly were as favorable to them as they could reasonably request. The jury was told that they must consider the evidence in its application to each particular defendant and was charged by separate instructions that even if one defendant stood by at the time the offense was committed but did no acts prior to the death of the deceased to aid and assist the same, such one was entitled to an acquittal; and that the mere presence of either of the defendants at the place where and at the time the homicide was committed was not sufficient to make such a person an aider or abettor of the crime. The rights of the defendants were carefully guarded by the charge of the court.

[3]  The defendants make the further complaint that the right of the jury, in the exercise of its discretion, to relieve the defendants of the death penalty, and impose imprisonment for life, was limited by the court's instructions. This contention is not supported by the record. The jury in effect was told that the exercise of discretion in this respect was substantially absolute, and it was free to return

a verdict carrying with it imprisonment for life, rather than the infliction of the death penalty, and that the infliction of either penalty was a question submitted solely to its sound judgment and discretion. The language of the instruction will not support a contrary construction. It therefore becomes unnecessary to cite authorities construing section 190 of the Penal Code, because there is not sufficient substance in the objection made to require a review of said authorities. [4] Defendant Rincon specially assigns as error the conduct of the prosecution in compelling him to revisit the Ullman home on the day the inquest was held at Lancaster, near the place where the crime was committed. After the preliminary examination had concluded, Adams and Rincon were handcuffed together and taken to the Ullman home. Rincon entered the house with considerable reluctance, while Adams seemed wholly unabashed. The latter freely recited the circumstances of the crime in a realistic manner, the greater portion of which we have herein related. Rincon, who was not represented by counsel, was informed by the prosecution that · he was not required to make any statement whatsoever. A number of the statements made by Adams incriminating Rincon were denied by the latter. At no time did Rincon admit his guilt, but at all times challenged the truth of the statements made by Adams that he, Rincon, struck the mortal blows or took any part in the homicide. He admitted that he assisted in carrying Ullman's body to the well, assisted in searching the home and riding into Los Angeles in Ullman's automobile with Adams after the commission of the homicide. He undoubtedly assisted in changing the appearance of the automobile on the following day and received his share of the small sum of money which Ullman had in his possession at the time he was assaulted. Upon the trial of the case several witnesses testified to the fact that Rincon, when taken to the Ullman house, was reluctant to enter and appeared to be very nervous and pale. His appearance and conduct at the Ullman home were shown in evidence and it was claimed that both were evidence of a consciousness of guilt. The claim is made by appellant Rincon that his enforced visit to the Ullman house compelled him to give evidence against himself. While we do not commend the procedure adopted by the prosecution, we do not see how Rincon could have

been prejudiced thereby. Had he made a confession of guilt under the circumstances related, a very serious question would be presented for our consideration. But this he did not do. His appearance under the stress of the situation had no special significance. The probabilities are very great that any person, whether he be guilty or innocent, if placed in his position, would have shown apprehension, which is usually exhibited by nervousness and pallor. We feel satisfied that the jury, composed of reasonable persons, was not affected prejudicially by anything that took place at the Ullman home. **[5]** Any statement there made not amounting to a confession was admissible against him without requiring preliminary proof of the fact that it was freely and voluntarily made. The distinction between a statement or admission of fact and a confession of guilt is well settled. (*People* v. *Ammerman*, 118 Cal. 23 [50 Pac. 15]; *People* v. *Connelly*, 195 Cal. 584 [234 Pac. 374].)

The judgment and order appealed from in each case is hereby affirmed.

Lawlor, J., Richards, J., Shenk, J., Waste, C. J., Lennon, J., and Curtis, J., concurred.

Rehearing denied.