[Crim. No. 6450. In Bank. Dec. 1, 1959.]

THE PEOPLE, Respondent, v. VERON ATCHLEY,
Appellant.

J. R. King, Jr., under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, and Doris H. Maier, Deputy Attorney General, for Respondent.

TRAYNOR, J.—A jury found defendant guilty of murder in the first degree and fixed the penalty at death. The trial court denied his motion for a new trial and sentenced him to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant was born in 1917 and was reared in a mountainous community in eastern Tennessee. He attended school only through the third grade and cannot read or write anything except his name. Some time between 1943 and 1946 he moved to California and worked in various localities as an agricultural laborer and a welder. He first met the deceased, Marcella Katherine (Farris) Atchley, when he was working near Fresno in 1953. He saw her a number of times before he left the Fresno area, and she bore a child that he claims is his. Defendant eventually entered the used car business in Palermo, California. He bought several lots, built houses on them, and lived

in one of the houses with Jewel Spoon, a woman who served as his secretary and bookkeeper. He met the deceased again in 1956 when she came to buy a used car. She returned frequently and after a series of fights with Jewel Spoon moved into defendant's home with five of her children. Jewel retired to a trailer behind the house and later left town. Defendant and the deceased quarreled frequently, but late in 1957 they took a trip and were married in Georgia. They did not publicize their marriage, hoping to avoid a reduction in the aid that she and her children were receiving from the county welfare department.

During the last few days of July, 1958, Mrs. Atchley and her children moved out of defendant's home to a house in Gridley, California. Although defendant assisted in making the move, a quarrel ensued and Mrs. Atchley complained to the police. Defendant then informed welfare personnel of her marriage to him. She in turn informed the authorities that defendant had been selling used cars without a license.

On the night of August 2, 1958, Mrs. Atchley went to a dance at Robinson's Corners with her oldest daughter and a young married couple. About 12:15 a. m. she drove her daughter home and then drove the young couple to their home in Oroville.

Defendant spent that evening drinking beer with several friends, but there is no evidence that he became drunk. Some time after midnight he drove to his wife's house in Gridley and discovered that she was not there. He drove back to Palermo, looking for her at Robinson's Corners and at several taverns along the way. He then returned to Gridley and drove by her house again. Noticing that her car was still absent, he parked his car about a block away and took from a glove compartment a 22-caliber pistol loaded with six or seven bullets. He placed the pistol inside the belt of his trousers and approached the house on foot through a back alley. He then waited in the alley and in the back yard, where he could see the headlights of his wife's car when she drove in.

About 2:25 a. m. Mrs. Atchley drove up to the carport attached to one side of her house. While she was parking, defendant moved along the opposite side of the house and stood by the front corner. Mrs. Atchley walked around to the front gate and up the walk. As she neared the door, defendant stepped out towards her. In the ensuing few minutes she was shot once in the head, once in the left breast, three times under the right arm, and, according to the prosecution's experts, once

in the back. Her body was later found about 3 feet from the front walk on the side opposite the point where defendant had stepped out. She was lying face down with her feet towards the walk and her head towards the carport.

Following the shooting defendant drove back to Palermo. He buried the gun in his back yard and hid the holster in an ash can. He then went to bed, where the police found him about 4 a. m.

At the trial defendant conceded most of the foregoing facts but maintained that he had been told that his wife was going out with another man, that he had taken the gun only to scare them, and that he had no intention of killing or injuring his wife. He stated that when he saw her returning alone, he stepped out to greet her; that his shirttails were tucked in so that the gun inside his belt was clearly visible; that she seized the gun and he struggled to recover it; that the gun went off several times during the struggle; and that after he recovered it, he fired it several more times. The defense introduced much testimony that Mrs. Atchley had said she wished to kill defendant, that she had threatened him with a gun on several occasions, and that she was a violent and combative person.

Two neighbors testified for the prosecution that they were awakened by the voice of a woman crying hysterically, ''Oh, don't, don't,'' followed by a series of shots. Looking out their bedroom window they saw defendant in a stooping position, shooting towards the ground. Because an intervening fence obscured the body, they assumed that he was shooting at the tires on Mrs. Atchley's car. They and another neighbor, who saw defendant arrive and walk into the back alley, testified that his shirttails were out. Defendant admitted at the trial that the gun inside his belt would not have been visible had his shirttails been out. To rebut defendant's story of a struggle for the gun, the prosecution introduced evidence that all of the shots were fired from such a distance that the deceased could not have been holding the gun at the time, that Mrs. Atchley was found with her keys still clutched in her right hand, and that five empty cartridge casings were found so close to each other as to indicate that the shots had been fired with the gun in approximately the same position. Other evidence indicated that defendant had threatened his wife, that she was afraid of him, and that most of the threats and all of the acts of violence attributed to her occurred during the period of her conflict with Jewel Spoon.

Defendant contends that the trial court committed prejudicial error in admitting certain evidence. He argues first that certain photographs introduced by the prosecution were gruesome in character, were unnecessary to the prosecution's case, and were offered several days before they were to be used by the expert witnesses, for the sole purpose of inflaming and prejudicing the jury.

When allegedly gruesome photographs are presented, the trial court in the exercise of its judicial discretion must decide whether their probative value outweighs their possible prejudicial effect. (*People* v. *Brubaker, ante,* pp. 37, 48 [346 P.2d 8]; *People* v. *Carter,* 48 Cal.2d 737, 751 [312 P.2d 665]; *People* v. *Cheary,* 48 Cal.2d 301, 312 [309 P.2d 431].) In the present case some of the challenged photographs show the deceased as she was found in her front yard, with bullet holes and bloodstains on her dress and blood on her face. They were used to illustrate testimony about her wounds and to show the relative positions in which the body and various items of evidence were discovered. Other photographs show the deceased lying on a table at the mortuary, naked above the waist, with blood smeared on her face. These pictures were used to show the location and nature of her wounds and to explain the basis for expert opinions as to the position of the gun when the shots were fired. Although many of these photographs are decidedly unpleasant to view, they are not comparable to those held inadmissible in *People* v. *Redston,* 139 Cal.App.2d 485, 490-491 [293 P.2d 880], or *People* v. *Burns,* 109 Cal.App.2d 524, 541-542 [241 P.2d 308, 242 P.2d 9], where the deceased was shown with a shaved head and disfigured by an autopsy. In view of their probative value, the trial court did not abuse its discretion by admitting them. It was also within the discretion of the trial court to permit all the pictures taken by the same photographer to be identified at the same time, even though many of them were not to be used until later in the trial.

Defendant also contends that the trial court erred in permitting the introduction of a tape recording of a conversation between defendant and his insurance broker, Ray J. Travers. The conversation took place in the interrogation room of the county jail two days after defendant had been arrested and before he had obtained a lawyer. Defendant was unaware that his words were being recorded and did not know that Travers had formerly been a police officer or that he had agreed to question defendant so that the recording could be

made. In response to Travers' questions defendant admitted arming himself, concealing himself, watching and waiting for his wife, surprising her, and firing several shots while the gun was in his hand. He maintained however, that the shooting occurred during a struggle for the gun and that he had no intention of killing the deceased. Defendant contends that these recorded statements constitute a confession and that they were made involuntarily because Travers held out as an inducement the payment to Mrs. Atchley's children of the proceeds of an insurance policy on her life. The People contend that defendant's recorded statements do not constitute a confession and were therefore admissible even if involuntary.

There has been considerable confusion as to the admissibility in a criminal proceeding of statements allegedly made by the defendant involuntarily. (See *People* v. *Linden,* 52 Cal.2d 1, 29, footnote 8 [338 P.2d 397].) Many opinions distinguish "confessions" and "admissions," and state that the latter are admissible without regard to their involuntary character. (*E.g., People* v. *Adams,* 198 Cal. 454, 465 [245 P. 821]; *People* v. *Fowler,* 178 Cal. 657, 664-665 [174 P. 892]; *People* v. *Garcia,* 124 Cal.App.2d 822, 825-826 [269 P.2d 673]; *People* v. *Trawick,* 78 Cal.App.2d 604, 608 [178 P.2d 45]; *People* v. *Cummings,* 7 Cal.App.2d 406, 408 [46 P.2d 778]; see *People* v. *Wolfe,* 42 Cal.2d 663, 670 [268 P.2d 475]; *People* v. *Ferdinand,* 194 Cal. 555, 568-569 [229 P. 341].) The distinctions between confessions and admissions, however, are "subtle and questionable."[1] (*People* v. *Chessman,* 52 Cal.2d 467, 493 [341 P.2d 679].) Moreover, a number of early cases suggest that even admissions must be excluded if involuntary. (*People* v. *Shem Ah Fook,* 64 Cal. 380, 381, 382 [1 P. 347]; *People* v. *White,* 47 Cal.App. 400, 401 [190 P. 821]; *People* v. *Harris,* 45 Cal. App. 547, 551 [188 P. 65]; *People* v. *Quan Gim Gow,* 23 Cal.

---

[1]For example, in *People* v. *Arnold,* 108 Cal.App.2d 719 [239 P.2d 449], the defendant was charged with murdering two men, Cavness and Greenway. His statement to the police after his arrest that he shot Greenway "because he saw me shoot Cavness" was characterized as a "statement of his reason for shooting" and held to be an admission, not a confession. In *People* v. *Cryder,* 90 Cal.App.2d 194 [202 P.2d 765], the defendant made an allegedly coerced confession to robbery and a subsequent statement, also allegedly coerced, that his confession was in the main correct. The latter statement was held not to be a confession. In *People* v. *Cronevitch,* 86 Cal.App. 646 [261 P. 309], the defendant was charged with burglarizing certain hotel rooms. After he was arrested and some of the stolen property found in his possession, he was asked when he had entered the rooms. His reply that "all the rooms were entered between two and four o'clock, as people were sound asleep at that time" was held not to be a confession.

App. 507, 510-512 [138 P. 918].) More recently, this court has stated that "the necessity for determining the voluntary character of the statement does not depend upon whether or not it constitutes a confession of guilt." (*People* v. *Nagle*, 25 Cal.2d 216, 222-223 [153 P.2d 344]; see *People* v. *Gonzales*, 24 Cal.2d 870, 874-875 [151 P.2d 251].) We have required preliminary proof of the voluntary character of statements that include "an important incriminating fact." (*People* v. *Nagle, supra*; see *People* v. *Eggers*, 30 Cal.2d 676, 689 [185 P.2d 1]; *People* v. *Quan Gim Gow*, 23 Cal.App. 507, 512 [138 P. 918].) Limitation of the exclusionary rule to full confessions has been rejected not only by the foregoing opinions of this court (*People* v. *Eggers, supra*; *People* v. *Nagle, supra*; *People* v. *Gonzales, supra*), but also by the American Law Institute (Model Code of Evidence rule 505) and the National Conference of Commissioners on Uniform State Laws (Uniform Rule of Evidence 63 (6); see also 78 A.B.A. Rep. 134). Moreover, the Supreme Court of the United States has held that the due process clause of the Fourteenth Amendment requires exclusion of coerced admissions if they are sufficiently damaging. (*Ashcraft* v. *Tennessee*, 327 U.S. 274 [66 S.Ct. 544, 90 L.Ed. 667]; but *cf. Stein* v. *New York*, 346 U.S. 156, 162-163, footnote 5 [73 S.Ct. 1077, 97 L.Ed. 1522].)

 Involuntary confessions are excluded because they are untrustworthy, because it offends "the community's sense of fair play and decency" to convict a defendant by evidence extorted from him, and because exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crime. (*People* v. *Berve*, 51 Cal. 2d 286, 290, 293 [332 P.2d 97]; see *Watts* v. *Indiana*, 338 U.S. 49, 54 [69 S.Ct. 1347, 1357, 93 L.Ed. 1801]; *Lyons* v. *Oklahoma*, 322 U.S. 596, 605 [64 S.Ct. 1208, 88 L.Ed. 1481].) All these reasons for excluding involuntary confessions apply to involuntary admissions as well. (See *Opper* v. *United States*, 348 U.S. 84, 90-92 [75 S.Ct. 158, 99 L.Ed. 101]; Falknor, *The Hearsay Rule and Its Exceptions*, 2 U.C.L.A. L. Rev. 43, 68.)

 Accordingly, any statement by an accused relative to the offense charged is inadmissible against him if made involuntarily.

 The People contend, however, that the voluntary nature of defendant's statements was adequately shown before the recording was admitted into evidence. Travers testified that no threats were made, that no inducements were offered, and that in an earlier conversation defendant had volunteered

substantially the same statements without being asked. Defendant at no time contradicted this testimony or suggested that any of his recorded statements were untrue. Moreover, the recorded conversation demonstrates that Travers referred to the insurance policy to explain why he was asking questions and not as an inducement for any particular answers. The trial court listened to the tape in chambers before ruling on its admissibility. There is therefore no merit in defendant's contention that the recording was admitted without a proper showing that his statements were made voluntarily.

Defendant also contends that the recording was obtained by such fraud that its use as evidence was inconsistent with due process. He relies primarily on *Leyra* v. *Denno,* 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed 948]. In that case the police, having promised a suspect medical treatment for an acutely painful attack of sinus, introduced as the ''doctor'' a highly skilled psychiatrist with a considerable knowledge of hypnosis. The psychiatrist used threats, promises of leniency, and expressions of sympathy to reduce the physically exhausted suspect to almost trance-like submission. Use of his resulting confessions violated due process, largely because they were the product of ''mental coercion.'' Although there was a similar deception in the present case, there was no comparable mental coercion. The deception itself does not render defendant's statements inadmissible, for it was not of a type reasonably likely to procure an untrue statement. (*People* v. *Connelly,* 195 Cal. 584, 597 [234 P. 374]; *People* v. *Castello,* 194 Cal. 595, 602 [229 P. 855].)

 While cross-examining Travers as to the voluntariness of defendant's recorded statements, defense counsel attempted to ask whether defendant had complained to Travers of not being permitted by the police, despite numerous requests, to talk to a lawyer. The trial court sustained an objection to this question and explained to the jury that the answer would have no bearing on the question of voluntariness. Defendant correctly contends that this ruling was erroneous, but fails to show that it was prejudicial. Although a refusal to permit defendant to talk to counsel suggests an intent to coerce, it seems highly improbable that either the trial judge or the jury would have inferred coercion from such a refusal alone in the light of the substantial and uncontradicted evidence that no coercion occurred.

 Defendant contends that the trial court erred in permitting the People to introduce on rebuttal a letter pur-

portedly written by the deceased to Judge Savage two days before she was killed. The letter itemized alleged sales of used cars made by defendant without a license, stated that defendant had threatened the deceased, and expressed her fear of him. Defendant contends that the introduction of this letter on rebuttal was prejudicial because he was unfairly surprised late in the trial and because several prosecution witnesses who could have been examined with regard to the letter and its contents had been finally discharged and could be recalled by defendant only as his own witnesses. The letter was admitted, however, with a limiting instruction, solely to show the deceased's state of mind and not to show that defendant had threatened her. It was therefore not objectionable as hearsay. (*People* v. *Brust,* 47 Cal.2d 776, 784-785 [306 P.2d 480] ; *Adkins* v. *Brett,* 184 Cal. 252, 255-259 [193 P. 251].) It tended to prove her fear of defendant, which was relevant to defendant's claim that she was the aggressor in a struggle for the gun. Since the claim of self-defense was raised as part of the defendant's case, the letter was admissible in rebuttal.

Defendant contends that the trial court committed prejudicial error in refusing to order the prosecution to produce certain rent receipts and in admonishing the jury to disregard defense counsel's statement that he would prove the receipts to be forgeries. Defendant asserts that he should have been permitted to use the receipts to impeach the prosecution's witness, Barbara Farris, who testified on cross-examination that she had never forged a rent receipt for the deceased and that she had seen the deceased pay rent to defendant and defendant give receipts for it. The question whether rent receipts had been forged to deceive the welfare authorities was clearly collateral to the issues being tried. The trial court had discretion to foreclose further inquiry along that line, even for purposes of impeachment. (See Witkin, California Evidence, § 673.) Moreover, in support of his request for the receipts, defense counsel offered to show merely that they were forged by Barbara "or someone else." Such a showing with regard to the particular receipts in question might well have been consistent with Barbara's testimony. Its value as impeachment, therefore, was questionable.

Defendant also contends that the trial court erroneously permitted the prosecution to cross-examine him improperly. The assistant district attorney asked him whether or not he had told the truth while testifying under oath in a

prior and unrelated criminal proceeding. Defendant argues that this questioning was not proper impeachment and was beyond the scope of matters raised on his examination in chief. (See Pen. Code, § 1323.) On direct examination, however, defendant testified in detail as to the finances of his household, which had apparently given rise to numerous quarrels with the deceased. In particular, he stated that she had paid him no rent. In the prior proceeding he had testified that a certain check constituted payment of rent she owed him. This testimony directly contradicted the statement made by defendant on direct examination. Even though the matter was collateral to the issues being tried, the trial court had discretion to permit the defendant to be questioned for purposes of impeachment as to his own prior inconsistent statement. (See Witkin, California Evidence, § 673.)

Defendant was also asked on cross-examination to demonstrate certain aspects of his alleged struggle with his wife. He argues that this demonstration violated his privilege against self-incrimination and that it was not proper cross-examination because not restricted to matters about which he was examined in chief. Defendant testified on direct examination that he had been carrying a loaded pistol inside his belt, that his shirttails were tucked in so that the gun was plainly visible, that he had scuffled with his wife for possession of the gun, and that it had gone off during the struggle. On cross-examination he was required to put on the shirt he had worn on the night of the killing, to show how he had carried the gun, and to demonstrate with an assistant district attorney his and his wife's movements during the alleged struggle. These matters were clearly raised by his direct testimony. He was also asked how long his wife's arms were, and replied that they were about the same length as his own. He was then asked to hold the gun at arm's length pointed towards himself with a finger touching the trigger. The distance from the muzzle to his body was measured and found to be 10 inches. This part of the demonstration, in combination with the testimony of the prosecution's experts that the gun was fired from at least 24 inches away, was directly related to defendant's statement on direct examination that the gun had gone off while he and his wife were struggling for it. The entire demonstration, therefore, was within the scope of permissible cross-examination (Pen. Code, § 1323; *People v. Ortiz,* 66 Cal.App. 154, 156 [225 P. 462]), and defendant waived his privilege against self-incrimination as to the mat-

ters involved when he voluntarily raised them on direct examination. (*People* v. *Arrighini,* 122 Cal. 121, 126 [54 P. 591]; *People* v. *Gallagher,* 100 Cal. 466, 474-476 [35 P. 80]; *People* v. *Withers,* 73 Cal.App.2d 58, 60-61 [165 P.2d 945].)

Defendant contends that the prosecution was guilty of prejudicial misconduct in its closing argument. The assistant district attorney suggested to the jury that the deceased had been shot initially in the back as she turned to run away. Defendant complains that this suggestion was based on facts not in evidence. There was evidence that a wound in the deceased's back marked the entrance of a bullet. From the position in which the body was found and other evidence, it clearly could be inferred that the deceased had turned to run. Although there was no evidence of the order in which she received the various wounds, the assistant district attorney's suggestion was nonetheless based on a reasonable interpretation of the evidence, and was therefore within the scope of permissible argument. (*People* v. *Cheary,* 48 Cal.2d 301, 317-318 [309 P.2d 431]; *People* v. *Burwell,* 44 Cal.2d 16, 39-40 [279 P.2d 744].)

The assistant district attorney also argued to the jury that if the prosecution's eyewitnesses were unable to see the killing from their bedroom window, as the defense had suggested, defense counsel would have requested that the jury view the premises. The basis for defendant's objection to this argument is not clear. It is generally permissible to argue to the jury that an adverse inference should be drawn from the opposing party's failure to produce the strongest available evidence. (*Cf.* Pen. Code, § 1323.) Morever, defense counsel had ample opportunity to respond to the argument or to point out that a countervailing inference could be drawn from the prosecution's failure to request a view.

The assistant district attorney misstated the law, however, when he told the jury that the killing of a human being while in the commission of a felony, to wit, assault with a deadly weapon, is murder of the first degree. (See Pen. Code, § 189.) Shortly thereafter he corrected his error and apologized to the jury. The court gave accurate instructions on murder and its degrees, and repeated those instructions at the jury's request shortly before the verdict was returned. It must be presumed that the jury followed the court's instructions and that defendant was not prejudiced by the assistant district attorney's earlier misstatement of the law.

The trial court instructed the jury that murder is in the first degree if perpetrated by lying in wait. (Pen. Code,

§ 189.) Defendant contends that the court's instructions were erroneous in that they permitted the jury to convict defendant of murder in the first degree without finding malice aforethought. The court, however, clearly defined murder in terms of malice aforethought.[2] The next succeeding instruction differentiated the finding of murder from the determination of degree.[3] All instructions on lying in wait expressly presupposed a finding of murder.[4] Defendant's contention is therefore without merit.

Defendant also contends that there was insufficient evidence to justify giving an instruction on lying in wait. The elements necessary to constitute lying in wait are watching, waiting, and concealment from the person killed with the intention of inflicting bodily injury upon such person or of killing such person. (*People* v. *Thomas*, 41 Cal.2d 470, 473 [261 P.2d 1].) The testimony of one neighbor indi-

---

[2] "Murder is the unlawful killing of a human being with malice aforethought.

"Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"Malice aforethought, either express or implied, is manifested by the doing of an unlawful and felonious act intentionally, deliberately, and without legal cause or excuse. It does not imply a pre-existing hatred or enmity toward the individual injured."

[3] "Murder is classified into two degrees, and if you should find the defendant guilty of murder, it will be your duty to determine the degree of the offense, whether first or second."

[4] "All murder which is perpetrated by means of lying in wait, or by any other kind of willful, deliberate and premeditated killing is murder of the first degree, and all other kinds of murder are of the second degree."

"All murder which is perpetrated by means of lying in wait is murder of the first degree.

"To constitute lying in wait, as the term is used in these instructions, a person's conduct must involve an intent to take another person unawares so as to do him bodily injury, and must include, as a means to that end, a waiting and watching for an opportune time to do the act, and also either a concealment in ambush or some other secrecy of design to take the other person by surprise.

"Lying in wait does not require any particular position of the body, or that the designing person refrain from moving about, or that he entice or trap the object of his design into any strange or puzzling situation, or that the lying in wait continue for any particular period of time, provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation."

"When the killing of a human being amounts to murder and is accomplished by lying in wait, it is murder of the first degree even though there did not exist in the mind of the slayer the specific intent to kill, but it is necessary that there be the intentional inflicting of bodily injury upon the person killed under circumstances likely to cause his death."

cated that defendant waited behind his wife's house for over an hour. The evidence included admissions by defendant that he parked a block away to conceal his presence, that he waited behind the house for about 25 minutes, that he was watching for the headlights of his wife's car, and that he surprised her by stepping out "right into her face." From the fact that he had armed himself with a loaded pistol and the evidence indicating that he shot her almost immediately upon her arrival, the jury could reasonably conclude that he was waiting for her with the intention of shooting her and that the shooting was accomplished "by means of" his watching and waiting in concealment. There was therefore sufficient evidence to justify giving the instruction.

Defendant contends that the trial court erred in excluding certain medical testimony as to defendant's mental condition at the time of the shooting. He relies on *People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53], which holds that medical testimony as to mental state is admissible to show lack of malice aforethought or lack of premeditation and deliberation. In his offer of proof, however, defense counsel stated that the proposed testimony would bear on defendant's ability at the time of the trial to remember what had occurred. There was no suggestion that it would bear on malice aforethought, premeditation, or deliberation. (*Cf. People* v. *Wells, supra,* at 345.) The record does not show, therefore, that evidence relevant to these issues was excluded.

Defendant did offer to elicit the doctor's opinion as to whether, in view of defendant's state of mind at the time of the shooting and after his arrest, it would be "normal" for him not to remember the details of the shooting or his statements to the police. He also proposed to ask the doctor about the reflex action of the trigger finger of a person under stress. The trial court ruled that the jury could evaluate these matters without the help of an expert. Both the mental stress created by involvement in a killing and the effect of such stress on finger reflexes, however, were "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*People* v. *Cole,* 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435]; *George* v. *Bekins Van & Storage Co.,* 33 Cal.2d 834, 844 [205 P.2d 1037].) As to both matters, therefore, the trial court's ruling was erroneous.

The erroneously excluded evidence was significant because defendant relied primarily on the theory that the shooting was accidental or in self-defense. Since no other witness ob-

served the first shots, it was critical whether the jury believed his story of a struggle for the gun. The proposed testimony as to reflexes might have served to render that story more credible by providing an explanation of why so many shots were fired and why defendant continued to shoot after recovering possession of the gun. The proposed testimony as to defendant's inability to remember might have served to make defendant appear more truthful by rebutting the prosecution's suggestion that he was lying about his memory.

Upon examination of all the evidence, however, it does not appear that the erroneous exclusion of this medical testimony resulted in a miscarriage of justice. (See Cal. Const., art. VI, § 4½.) Although the testimony as to reflexes might have made defendant's story of a struggle more credible, there was abundant evidence inconsistent with a struggle, including the distance from which the shots were apparently fired, the proximity in which the five empty cartridge casings were found, the fact that defendant had armed himself and waited for his wife, the cry heard by the neighbors, and the fact that virtually every bullet in defendant's gun entered her body. Although the testimony as to defendant's inability to remember might have met one line of attack on his credibility, other lines of attack were given far more emphasis by the prosecution. Defendant was shown to have lied repeatedly to the police after his arrest and to have lied under oath in a prior criminal proceeding. Moreover, his credibility was important primarily as it affected the jury's belief in his story of a struggle for the gun. The evidence inconsistent with that story was abundant and convincing. There is therefore no reasonable probability that admission of the excluded medical testimony would have persuaded the jury to reach a different result. (See *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment and order denying a new trial are affirmed.

Gibson, C. J., Schauer, J., Spence, J., McComb, J., Peters, J., and White, J., concurred.

Appellant's petition for a rehearing was denied December 30, 1959.