[Crim. No. 2726. In Bank.—March 12, 1925.]

## THE PEOPLE, Respondent, v. JOHN CONNELLY, Appellant.

[1] CRIMINAL LAW — MURDER — SUFFICIENCY OF EVIDENCE. — In this prosecution for murder it is held that the evidence in the case, if believed, positively established the guilt of the defendant.

[2] ID.—IDENTIFICATION OF DEFENDANT—QUESTION OF FACT.—In a prosecution for murder, the question of the identity of the defendant and his relation to the murder charged against him is a matter wholly within the province of the jury, and where

there is ample evidence to sustain a finding implied in a verdict of guilty, it will not be disturbed on appeal.

[3] ID.—EVIDENCE—STATEMENTS AND ADMISSIONS.—In a prosecution for murder, there was no error in admitting in evidence certain statements made by the defendant to the sheriff, where the record does not show that the statements or admissions amounted to confessions, that they were made prior to advice, which the court ruled fell within the rules of exclusion, given by the sheriff to the defendant and which was made the ground on which the court held that whatever was thereafter said in the nature of a confession by the defendant to the sheriff or district attorney, was inadmissible, and where if the admissions complained of amounted to a confession the court, in the exercise of its discretion, by admitting the evidence objected to, determined it to be legally free and voluntary.

[4] ID. — UNTRUE STATEMENTS OF SHERIFF TO DEFENDANT — STATEMENTS BY DEFENDANT.—An untrue statement made to the defendant in a murder case by the sheriff, to the effect that finger-prints taken from a cash register, which it was claimed .defendant robbed at the time of the murder, corresponded with his, was not legally sufficient to justify the exclusion of statements subsequently made by the defendant.

[5] ID.—PROCURING CONFESSION BY FALSEHOOD—ADMISSIBILITY OF.— The fact that a confession of crime was procured by the employment of falsehood by a police officer, detective, or other person does not alone exclude it; nor does the employment of any artifice, deception, or fraud exclude it, if the artifice or fraud employed was not calculated to procure an untrue statement.

[6] ID.—ADMISSIONS — CONFESSIONS — DEFINITION.— Statements made by a defendant charged with crime do not amount to a confession where there is no admission of guilt, and although such statements may be regarded as some evidence of a consciousness of guilt, this does not bring them within the definition of a confession, which term is restricted to acknowledgment of guilt.

[7] ID.—EVIDENCE—ADMISSIBILITY.—The rule is that the admission of the truth of matters which, while they do not themselves involve guilt, but when connected with other facts tend to prove guilt, does not render the proof of such matters inadmissible,

4. Effect of language assuming guilt addressed to accused on admissibility of confession in evidence. Notes, 18 L. R. A. (N. S.) 802; 50 L. R. A. (N. S.) 1085. See, also, 1 R. C. L. 560.

6. See 1 R. C. L. 500; 8 Cal. Jur. 106.

and proof of such admissions is competent without the pre-
liminary proof.

[8] ID.—CONFESSIONS—PRELIMINARY PROOF—DISCRETION.—In a prose-
cution for murder, even though admissions of the defendant be
regarded as confessions, the question as to whether they were
freely and voluntarily made is a preliminary question addressed
to the trial court, and its discretion will not be disturbed in
the absence of a showing that the court abused its discre-
tion.

[9] ID.—ADMISSION OF EVIDENCE—LACK OF ERROR.—In this prosecu-
tion for murder it is held that there were no prejudicial errors
committed by the trial court in its rulings on the admission of
evidence.

[10] ID.—INSTRUCTIONS—KILLING POLICE OFFICER—SELF-DEFENSE.—
In a prosecution for murder of a peace officer, an instruction
to the jury in effect that if anyone kills an officer while such
officer is lawfully making or endeavoring to make an arrest, or
properly or in lawful manner, doing any other official act, the
homicide so committed can neither be excused as an act of
self-defense, nor mitigated on the ground of provocation, but
is deemed to have been done with malice in willful defiance of
public justice, and such killing is murder, is not open to the
criticism that it omits to except killing by accident or from
any cause which did not show an intent to kill, where there
was absolutely no evidence tending to show that the killing
was accidental, and the court instructed the jury fully as to
excusable and justifiable homicide and as to intent, and the
jury was told that in every crime or public offense there must
exist a union, or joint operation, of act and intent, or criminal
negligence, and where from such instruction read with others
there could have been no misunderstanding as to the elements
necessary to constitute murder.

[11] ID. — INSTRUCTIONS — SUFFICIENCY OF. — In this prosecution for
murder it is held that the instructions contained a full, fair,
and complete exposition of the law of murder.

[12] ID.—IMPEACHMENT OF VERDICT.—It is the well-settled rule in
this state that a juror cannot impeach his verdict except where
it is the result of resort to the determination of chance; and
a defendant will not be allowed to show on a motion for a
new trial that the jury in arriving at their verdict acted
under a misapprehension of the law, believing that the court
had the discretion of fixing the punishment at life imprison-
ment, and that during their deliberations they disagreed upon
the interpretation of the law and asked to be allowed to speak
to the court, but the district attorney not being available,

they decided the question for themselves without the aid of further instructions from the court.

(1) 30 C. J., p. 303, n. 25.    (2) 17 C. J., p. 270, n. 17; 30 C. J., p. 328, n. 2.    (3) 16 C. J., p. 571, n. 11, p. 717, n. 39, p. 735, n. 38; 17 C. J., p. 242, n. 51.    (4) 16 C. J., p. 729, n. 3.    (5) 16 C. J., p. 729, n. 3, 4, 5.    (6) 16 C. J., p. 715, n. 2, 5.    (7) 16 C. J., p. 626, n. 80, p. 629, n. 21.    (8) 16 C. J., p. 735, n. 26 New, n. 34, 35; 17 C. J., p. 242, n. 51.    (9) 17 C. J., p. 317, n. 10.    (10) 16 C. J., p. 1050, n. 84; 30 C. J., p. 366, n. 4, p. 381, n. 93, p. 393, n. 97.    (11) 30 C. J., p. 366, n. 4.    (12) 16 C. J., p. 1236, n. 50, p. 1238, n. 83 New.

APPEAL from a judgment of the Superior Court of Yuba County and from an order denying a new trial. Eugene P. McDaniel, Judge. Affirmed.

The facts are stated in the opinion of the court.

Arthur M. Bundy and J. E. Ebert for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Ray Manwell, District Attorney, for Respondent.

SEAWELL, J.—The defendant, John Aloysius Connelly, was, on the twenty-seventh day of June, 1924, by an indictment returned against him by the grand jury of the county of Yuba, this state, accused of the crime of murder, alleged to have been committed by him in said county of Yuba on or about the sixth day of February, 1922, by unlawfully and premeditately taking the life of one Francis Heenan. The defendant was indicted under the name of Joe Kelly, *alias* John Connelly, but at the trial he claimed his true name to be as first above stated.

In due time he was placed upon trial for said crime and the jury returned a simple verdict of murder in the first degree against him. The court thereupon pronounced the judgment which the law imposes in such cases, to wit, the death penalty. From the judgment of conviction and the order denying a new trial the defendant has appealed.

The several specifications of error made by appellant will be noticed as the importance of the same may require. The facts of the case are simple, and briefly narrated are:

At about the hour of 9 o'clock P. M., February 6, 1922, an armed man, identified by a number of persons as the defendant, entered a soft-drink parlor in which intoxicating liquor was sold as well as soft drinks, known as the Canteen Saloon, in the city of Marysville, for the purpose of committing a robbery. Within a small private room, which is a part of said saloon premises, the entrance to which was by way of a gate or opening in the bar, were seated two mutual friends and acquaintances of the barkeeper. These persons were out of the line of vision of anyone entering the saloon from the front doors. The barkeeper was at the moment of defendant's entry engaged in conversation at the bar with a third party, who fled from said premises and was not present at the trial. All of the persons in the place when the entry was made by the bandit, four in number, except the one who fled, were natives of Greece. The defendant, according to the testimony of three eyewitnesses, entered one of the double swinging doors and advanced as near to the barkeeper as the bar would permit. He was not masked. The barkeeper was behind the bar, and the defendant, pointing a pistol at him, commanded him to hold up his hands, which the barkeeper either declined to do or was slow in complying with the command, and the defendant thereupon said, "Come on, I will blow your brains out." The barkeeper testified that as the defendant put the pistol to his face he "ducked" and the pistol was discharged, the bullet passing close to him, but the distance was not definitely fixed. The barkeeper then ran to the private room, where his two acquaintances were, and attempted to unlock a door that opened into the street, without success. The evidence indicates that a money safe was in this room. The defendant followed the barkeeper into the private room as quickly as physical barriers would permit, and, with drawn revolver, ordered all three of the men to throw up their hands. The order was complied with. Some conversation took place as to the safe. The barkeeper's statement is to the effect that the defendant asked as to the location of the safe, while the other men in the room, one of whom spoke superior English, testified that the barkeeper told the defendant that he could not open the safe; that he had no key. At any rate the defendant compelled all of the men to follow him from the private

room and take positions behind the bar. The cash register was on the back bar and the barkeeper was ordered to open it. He declined and told the defendant to open it himself, which he did with his left hand after some manipulation, keeping the pistol all the while pointed at the barkeeper and requiring all present to continue to keep their hands up. About $100 in coin and currency was taken from the cash register. The defendant then retired from behind the bar, backing toward the swinging door entrance with the pistol leveled at the barkeeper and compelling the latter to follow him at a distance of four or five feet as he was backing toward the door. The distance from the bar to the swinging doors was in the neighborhood of fifteen feet. When the defendant arrived at a point very close to the swinging doors, the deceased, who was a police officer of the city of Marysville and attired in a uniform of his rank, entered. The officer, before he entered, had been informed that a robbery was being committed in the place. As the officer entered the door he said to the defendant, who was near to him, "Now, what are you doing here?" or "What's going on here," or made some such inquiry. Instantly the defendant threw his gun upon the officer and fired a shot which pierced the body of the officer and cut the arch of the aorta, causing almost instant death. The officer uttered an exclamation merely and reeled to the floor, dead. The bullet had passed through his body. The defendant fled and was pursued by the barkeeper, who had been handed the officer's pistol by one of the men who were in the saloon during the robbery. In the pursuit he lost sight of the defendant and returned to the saloon. The news of the death of the officer aroused the citizens, many of whom joined in a search for the bandit. At about 1:40 o'clock on the following morning, P. D. Scandalis, a member of the searching party, met the defendant, who was traveling slowly with a roll of blankets upon his back, and upon stopping him and making a search of his person and roll of blankets for arms, permitted him to go his way. The defendant was walking at a slow, hobbling gait, and claimed to be shivering from cold, begged the witness to let him go, as he was looking for a place to lie down. His conduct was unusual. He gave as an excuse for being out at that hour of the night that the officers had chased him from a box-car. He

was cursing the officers and said he wished he had a gun. The defendant, according to the witness, appeared to be very careful of his hat. In fact, he had taken his hat off. This was the last seen of the defendant in this state by anyone who was able to identify him as the suspect until he was arrested near Douglas, state of Wyoming, and returned to Marysville some two years after the homicide. The defendant, according to his own story, left Marysville on the morning of February 7, 1922, and made his way to Oroville, thence to Portola, where he was storm-bound for a period of three days, and thence to Ogden, Cheyenne, and finally to Caspar, Wyoming. At Oroville and other places he read in the press an account of the murder and a description of the bandit suspected of having committed the crime, whose name was given as Joe Kelly. He admitted that he was known by the name of Joe Kelly, but as the description of the murderer did not fit him, except as to his name, and as to his hair being gray, he continued to make his way out of the state. Upon leaving Marysville he assumed and retained the name of Farley. At Portola he disposed of his hat and bought a cap. His effort at the trial to create the impression that had the description of the suspect which he had read in the papers fitted him he would have returned to disprove any suspicion that may have been cast upon him was wholly inconsistent with the excuse he offered for continuing his flight from the state, to wit, that the slaying of a popular officer had aroused a bitter feeling in the public mind, which made it dangerous for anyone who might be accused of the crime, and the further disadvantage that he would have been put to by reason of having suffered a former conviction for felony, were odds against which, though innocent, he could not hope to prevail.

In addition to the direct testimony given by the three persons that were held in duress by the unmasked defendant for something like ten minutes while he was executing the robbery, a fourth person, who was a waiter in a local coffee-house, and who was well acquainted with the defendant, was an eye-witness to a part of the crime. This witness, at the time the first shot was fired, was engaged in conversation with the officer who was killed a few minutes later, at a point not more than 160 feet distant from the

Canteen Saloon. At the report of the pistol shot this witness and the officer started to investigate the report. The witness preceded the officer slightly, and as he came to the place that was being robbed he paused and looked through a window and observed the defendant behind the bar in the act of taking the money from the cash register drawer and putting it into his pocket. Defendant had the pistol in his hand. The witness warned the officer, who was approaching the saloon door, that it was a hold-up, and to look out. The officer entered the saloon hurriedly, while the witness lagged a little behind. As the officer entered he made some inquiry as to what was going on, and the defendant immediately pointed the pistol at him and fired, with the result already related. The defendant, as he fled, passed quite near to the witness, with the pistol smoking in his hand, and disappeared into the darkness. The witness, who had known the defendant quite well for some time past, said that he had a good view of the defendant's face, both while he was behind the bar committing the robbery and as he passed by him leaving the saloon.

A fifth witness, who had served time in the Montana state prison at the same time that the defendant was serving on a felony conviction—1916–1918—and who was well acquainted with the latter, was brought from the Montana state prison, where he was serving a second term, to testify in the case. His testimony was that he met the defendant twice during the evening on which the murder was committed. The first time was at the hour of about 6:30 o'clock and the second time was at about 8:45 o'clock, as the witness was returning to his home after having attended a picture show. The defendant was then talking with a friend called Gimp Riley, and as the witness approached the two they engaged him in conversation. The defendant said to him if he wanted to see some fun to "stick around." The witness asked what he was going to do, and he replied that he was going to make Parades place "elevate" and then he was going to "get the wop joint on the corner." Upon being asked what he meant by the term "wop joint," he replied that he meant the Canteen Saloon. He exhibited to the witness a white-handle pistol which he was carrying in the inside pocket of his coat. The witness at the time was engaged as a janitor in a local church, and on the follow-

ing day he reported the matter to a parish priest and to the sheriff and the district attorney of the county and gave them a description of the defendant. An intensive search was made but the defendant could not be found in or about Marysville. That the defendant fled the state and concealed his identity to avoid meeting the charge of having murdered the officer there is not the slightest room for doubt.

[1] The evidence in the case, if believed, positively established the guilt of the defendant. Four eye-witnesses testified to the robbery, three of whom actually witnessed the shooting and the fourth saw a pistol in the hand of the defendant immediately before the shot was fired and saw smoke issuing from it as the defendant held it in his hand as he left the place where the killing occurred immediately after the fatal shot was fired. A fourth witness testified to the planning and preparation of the robbery by the defendant. To this may be added other incriminatory and corroboratory circumstances arising from the defendant's conduct and flight immediately following the shooting.

Appellant assails the character of the principal witnesses for the people, on the ground that one was serving a second term in a penitentiary; the second was an admitted violator of the National Prohibition Act and two others, by reason of their presence in and patronage of the Canteen Saloon, were aiding and abetting the violation of said act. We are also reminded of the claim made that the barkeeper, in particular, identified another person as the bandit shortly after the homicide was committed. Two or three persons, including newspaper representatives, testified that the description given by the barkeeper, and by two other witnesses to the killing, did not tally with the defendant in some important physical respects and the clothing worn by the defendant did not agree with the wearing apparel described by said witnesses. It is true that shortly after the killing the barkeeper leaned strongly to the opinion that a person who was detained as a suspect was the person who had committed the crime. He explained, however, that while the resemblance was strong, the suspect had the appearance of being quite a bit younger than the defendant. At any rate the suspect was not held upon the identifications made by any of the witnesses to the shooting. The barkeeper,

from a number of photographs shown him, selected the
photograph of the defendant as being the picture of the
man who actually committed the murder and from the
moment he first saw the defendant he was very positive
in his identification. The other two witnesses were reason-
ably certain of their identification of the defendant. The
waiter, who was conversing with the officer at the time
the first shot was fired, and who observed him through a
window in the act of committing the robbery and then
again as he left the place of crime, was positive in his iden-
tification. While discrepancies or inaccuracies may have
occurred in the attempts of the several witnesses to repro-
duce descriptively the features and lineaments of the de-
fendant from mental pictures, nevertheless when the defend-
ant was brought into their presence, each one identified
him as the person who took the life of the officer. They
had had ample time to observe his features, bodily move-
ments and, in addition thereto, had heard him speak. Or-
dinarily the power to accurately describe human features
is with most persons a limited power, and, therefore, on
questions of identification, except in special instances, much
must depend on the intelligence and honesty of the person
called upon to make the identification by personal observa-
tion of the person to be identified. It is not reasonably
probable that there could exist in the instant case a mis-
take as to the identity of the defendant in his relation to
the murder charged against him. [2] This was a matter
wholly within the province of the jury, and there being
ample evidence to sustain an implied finding to that effect,
we are not at liberty to disturb it. Counsel for appellant
urges the commission of error in admitting in evidence
what he terms confessions of guilt made by the defendant
to C. J. McCoy, sheriff of Yuba County, both while the
defendant was being transported from Wyoming to Yuba
City in the custody of said officer and while he was detained
in the Yuba County jail awaiting trial. [3] There are
three answers to this claim of error. First, the record
does not show that the statements or admissions made by
the defendant—save possibly in one instance and for this
the cross-examination of the sheriff by appellant's counsel
was responsible—amounted to confessions. Second, the ad-
missions or statements objected to as confessions were made

prior to the advice, which the court ruled fell within the rules of exclusion, given by the sheriff to the defendant and which was made the ground on which the court held that whatever was thereafter said in the nature of a confession by the defendant to the sheriff or district attorney, was inadmissible. Third, if the admission complained of amounted to a confession the court, in the exercise of its discretion by admitting the evidence objected to, determined it to be legally free and voluntary. And we cannot say under the evidence herein that it committed an abuse of discretion in so doing.

The fraud and imposition claimed to have been practiced upon the defendant as an inducement to influence or obtain a confession from him consisted in the sheriff telling the defendant that the finger-prints made upon the cash register had been taken and that they corresponded with the prints of the defendant. As a matter of fact, an attempt was made by Hart S. Schroeder, Jr., the state identification and micro-analytical expert, to take the finger-prints, but it was known to the sheriff that no reliance could be placed upon them as other finger-prints had been superimposed upon the cash register. The expert said that they may have been the prints of the defendant or "of any person." Like error is claimed because of the admission of testimony given by the sheriff to the effect that the defendant had told the sheriff that he, defendant, had read in the newspapers that he knew he was wanted for murder and that he was glad that he was arrested as he had been keeping out of the way of the officers for a long time and it had been a hard strain on him. In this connection he stated to the sheriff that he "had lung and kidney troubles and it didn't make much difference to him now." The sheriff admitted that he told the defendant exactly the evidence the state had against him and gave him the names of the witnesses. The defendant narrated his flight and said that it was his intention at one time to let his beard grow; he also said he was going to make his "get away" if he possibly could. His words in this respect were: "You can't blame a man in the same condition I am if a chance comes up to make a get away." Also the defendant admitted that he bought the cap at Portola for the purpose of disguising

his identity. The concluding portion of the testimony to which appellant particularly objects as having influenced the defendant in making the statement or admissions claimed to have been made by him, but which he denied making at the trial, as found in the record, are: "I [sheriff] told him I had located certain witnesses. He said to me 'you have all the witnesses?' and I said yes. He said: 'I have been identified by all of them?' Then he said, 'I think I will go upstairs and enter a plea of guilty. What do you think the judge will do with me?' I told him the judge would hang him. Then he went on and told me that he didn't think he had a chance and he wanted me to send for the district attorney and I told him the district attorney was out of town. Then I said to him, 'Why don't you make a confession to the district attorney?' Then he said to me, 'I think I will have you send for my lawyers so I can tell them I am going to plead guilty.'" The sheriff then left and did not return until several hours thereafter. The defendant then requested him to send for the district attorney. Upon the arrival of the district attorney, the defendant, sheriff and district attorney went into the sheriff's private office. At this point in the proceedings the court announced that the objection as to any conversation or any part of any conversation that may have taken place between the defendant, the district attorney, and the sheriff would be sustained on the ground that the inquiry made by the sheriff of the defendant, to wit, "Why don't you make a confession to the district attorney?" amounted to advice and counsel coming from one in authority and was, therefore, inadmissible. Whatever was said by any of the parties to the conversation was not told. Later it developed that the request of the defendant to be taken to the district attorney's office occurred before the sheriff asked why he did not make a confession to that officer, but the court's ruling was not changed.

On cross-examination counsel for the defendant drew from the sheriff by direct interrogatory the following answer on a specific subject not touched upon by the district attorney: "Q. Didn't you say to him on one of your visits to him prior to July 3d in substance this: 'Joe, I don't think you are a cold-blooded murderer; the way I figure it out is this: You had a gun you are not used to and in the

scuffle it accidentally went off and that is the way he was killed'; Didn't you make that statement to him? A. 'I did, yes.' '' Upon redirect examination the district attorney attempted to fix the time in the order of events when the above question was asked and answer given, that is, whether it was prior or subsequent to the time the defendant was asked why he did not confess to the district attorney, which occurred on July 3d. The witness answered that he did have a conversation with the defendant in regard to a "gun" before July 3d. The court, in an effort to straighten out the confused situation, said: "You make any explanation you desire." The witness then proceeded: "I told him, 'I says Joe, I don't think you are a cold-blooded murderer; you had a gun, one of these guns you fan, you can't cock it; the only way you can do is to hold the trigger back?' He says, 'I think that is the way it happened,' but I told him all the time he was talking to me, when he was talking about going upstairs and pleading guilty, I told him if he went up there the judge would hang him.' ''

This testimony seems to have been brought out without objection on redirect examination and no motion was made to strike it out. As a part of the subject matter was brought out by the defense, it was proper for the witness to tell all that was said on that subject, even though the balance was not favorable to the defendant.

Objection was also made to the testimony of the witness Scandalis which was directed to a conversation which he had with the defendant at the county jail on July 19th while he was there for the purpose of delivering some article of merchandise to another prisoner. The objection was made on the ground that anything he may have said in the nature of a confession was influenced by the advice that the sheriff had given to the defendant on July 3d, and therefore inadmissible. It was shown by preliminary examination that the witness was in no way connected with any of the law or peace officers, and the court admitted the evidence. The witness remarked to the defendant that a report was on the streets that he was going to confess, and asked him if the report was true. The witness' answer was: "He told me he would confess if he knew the judge would give him life, but he knew the judge was going to hang him, that is why he wouldn't confess."

[4] The untrue statement made to the defendant by the sheriff to the effect that the finger-prints taken from the cash register corresponded with his was not legally sufficient to justify the exclusion of the statements subsequently made by the defendant. While the indulgence in deceptive methods or false statements is not morally justifiable or a commendable practice, this alone would not render even a confession of guilt inadmissible. In the recent case of *People* v. *Castello,* 194 Cal. 595 [229 Pac. 855], we had an occasion to review the text-books and the decisions of this court on this particular subject, and adopted the following paragraph as a sound exposition of the principle:

[5] ''The fact that a confession was procured by the employment of falsehood by a police officer, detective, or other person does not alone exclude it; nor does the employment of any artifice, deception or fraud exclude it, if the artifice or fraud employed was not calculated to procure an untrue statement. Neither does the fact that a confession was obtained by a promise of secrecy render it incompetent, if there was no motive to produce a false statement.'' (16 C. J. 729.)

[6] We are of the opinion that none of the statements made by the defendant amounted to a confession of guilt. At no time did he admit his guilt. His statements may be regarded as some evidence of a consciousness of guilt, but this does not bring them within the definition of a ''confession.'' In *People* v. *Ammerman,* 118 Cal. 23 [50 Pac. 15], a confession is defined as ''a person's declaration of his agency or participation in a crime. The term is restricted to acknowledgment of guilt. (*People* v. *Strong,* 30 Cal. 151; *People* v. *Parton,* 49 Cal. 632; *People* v. *LeRoy,* 65 Cal. 613 [4 Pac. 649]; 1 Greenleaf on Evidence, sec. 170.)'' While the defendant did not deny the commission of the crime, as the defendant did in the Ammerman case, he made no confession of guilt. [7] The rule is that the admission of the truth of matters which, while they do not themselves involve guilt, but when connected with other facts tend to prove guilt, does not render the proof of such matters inadmissible. Proof of such admissions is competent without the preliminary proof. (*People* v. *Ammerman, supra,* and cases cited therein.) As we have before stated, the only statement that could in any sense be re-

garded as a confession was the statement concerning the
discharge of the pistol, which was brought into the case as
heretofore explained. All other statements were guarded as
to a confession, and the one last specifically mentioned is
not a definite confession of guilt. [8] But even though
the admissions be regarded as confessions, the question as
to whether they were freely and voluntarily made was a
preliminary question addressed to the trial court, and its
discretion will not be disturbed in the absence of a show-
ing that the court abused its discretion. The statement
made by the defendant to the witness Scandalis to the effect
that he would enter a plea of guilty if assured by the judge
that no graver judgment would be pronounced than life
imprisonment was not a confession of guilt. Moreover, the
court found that it was freely made.

There is no merit in the contention that the testimony
of the sheriff as to the statement made to him by the de-
fendant was not admissible unless it should also be shown by
Officer Booth, who assisted the sheriff in bringing the de-
fendant to Yuba County, that said officer had not induced
the defendant in any way to make said statements to the
sheriff. The sheriff purported to testify fully as to all
that was done or said by him in the matter. No serious
contention was made at the trial that any statement or
confession was made to Booth in the absence of the sheriff.
The defendant took the witness chair in his own behalf
and testified to conversations had with the sheriff, but made
no claim that Booth had at any time or in any manner
attempted to procure a statement or confession from him.
There was nothing surreptitious in Booth's absence from
the trial.

[9] We have examined the assignments of error pre-
sented by the defendant as to the court's rulings on questions
of evidence and we are satisfied that no prejudicial errors
were committed.

Exception is taken to that portion of the court's charge
which reads as follows:

"Therefore, if anyone kills an officer while such officer is
lawfully making or endeavoring to make an arrest, or prop-
erly or in lawful manner, doing any other official act, the
homicide so committed can neither be excused as an act of
self-defense, nor mitigated on the ground of provocation,

but is deemed to have been done with malice in wilful defiance of public justice, and such killing is murder.

"I instruct you that if you find from the evidence to a moral certainty and beyond a reasonable doubt, that the deceased, Francis Heenan, was at the time of the alleged homicide a public officer of the City of Marysville, and that he was then and there properly and in lawful manner endeavoring to arrest defendant upon a felony charge of which he had reasonable ground to believe defendant guilty; and if you should further find beyond all reasonable doubt and to a moral certainty that said defendant, then and there knowing himself to be charged with a felony and in order to avoid such arrest upon such felony charge, did then and there shoot and kill said Francis Heenan, then I charge you that such killing cannot be excused as an act of self-defense nor mitigated on the grounds of provocation."

[10] The objection made to the criticised instructions is that they omitted to except killing by accident or from any cause which did not show an intent to kill. There was absolutely no evidence tending to show that the killing was accidental. Besides, the court instructed the jury fully as to excusable and justifiable homicide. The jury was further instructed as to intent and told that in every crime or public offense there must exist a union, or joint operation, of act and intent, or criminal negligence. Read with other instructions there could have been no misunderstanding as to the elements essential to constitute murder. The defendant denied the killing and there was no evidence offered which tended to show self-defense, or justifiable or excusable homicide or manslaughter. [11] The instructions contain a full, fair and complete exposition of the law of murder and informed the jury that it was within their discretion to relieve the defendant of the extreme penalty of the law.

Upon the motion for new trial the defendant offered to call to the witness-stand certain of the jurors to prove by them that in arriving at their verdict they acted under a misapprehension of the law, believing that the court had the discretion of fixing the punishment at life imprisonment; also during their deliberation they disagreed upon the interpretation of the law and that they had asked that

they be allowed to speak with the court. The district attorney not being available, they decided the question for themselves without the aid of further instructions from the court. As before remarked, the instructions were full and complete on every phase of the law essential for the guidance of the jury. **[12]** Besides, it is the well-settled rule in this state that a juror cannot impeach his verdict except where it is the result of the resort to the determination of chance. (*People* v. *Azoff,* 105 Cal. 632 [39 Pac. 59]; *People* v. *Soap,* 127 Cal. 408 [59 Pac. 771]; *De Cou* v. *Howell,* 190 Cal. 741 [214 Pac. 444].) A long list of authorities definitely settling the law in this respect might be cited.

We have examined the record with care and find that no prejudicial error was committed in the trial of the case.

The judgment and order appealed from are affirmed.

Lawlor, J., Richards, J., Shenk, J., Waste, J., Lennon, J., and Myers, C. J., concurred.

Rehearing denied.

All the Justices concurred.