[Crim. No. 4945.   Second Dist., Div. One.   May 21, 1953.]

## THE PEOPLE, Respondent, v. GEORGE RUTH HYMER, Appellant.

Percy Drabin and Stanley C. Poster for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was accused of the crime of burglary, in that he did on or about May 5, 1952, wilfully enter a factory and building occupied by Z.M.R. Manufacturing Company, a corporation, with the intent to commit theft.

Following entry of a plea of not guilty, the cause proceeded to trial before a jury, resulting in a verdict finding defendant guilty as charged, and fixing the offense as burglary of the second degree.

Defendant's motion for a new trial was denied. Proceedings were ordered suspended and defendant was granted conditional probation. From the order denying his motion for a new trial defendant prosecutes this appeal.

Epitomizing the factual background surrounding this prosecution, we find in the record testimony by Sydney Rubin, secretary and treasurer of the Z.M.R. Manufacturing Company, that the business of this corporation was located on a portion of the third floor of a seven-story building at 224 East 11th Street, in the city of Los Angeles. That there was a large double door which was the main entrance, with two smaller and swinging doors on each side. That the building had a stairway and the front elevator was automatic after 6 p. m. The entrance to the manufacturing company's premises on the third floor was off a hallway. That there was a wooden frame double door which had three locks.

This witness testified he was the last person to leave the company's premises on the evening in question. That he departed about 5 p. m. and locked up the premises. That his company was engaged in the business of manufacturing ladies' and misses' coats and that a stock of such garments was maintained on the premises.

Lyle L. Sandlin, a Los Angeles City police officer, testified that on the night here in question he was near the aforesaid building, was in uniform, and stationed at the southeast corner of 11th and Santee Streets. That just prior to 7 p. m. (it was still daylight and the sun was shining) he observed defendant seated on the driver's side of his automobile parked at the curb and headed west on 11th Street on the opposite side thereof from 224 East 11th Street. That he was about 150 feet from the vehicle. The witness observed **a man run**

out of the main entrance of the building with an armful of ladies' coats. This man ran to the rear of defendant's automobile; at about the time he reached it, defendant got out, opened the trunk and the other person threw the garments inside. Defendant slammed the cover down. A red sleeve of one of the coats stuck out from under the trunk lid. Defendant raised the lid, shoved the coat sleeve in again, slammed the door down and got into the driver's side of the automobile. In the meantime, the other person ran back across the street and reentered the building. The placing of the coats in the trunk and the closing of the trunk took place very rapidly. After defendant got back in his automobile he started the motor, drove west 35 or 40 feet to an alley, made a U-turn and came back and parked directly in front of 224 East 11th Street.

The officer started to walk across the street toward where defendant was. The latter looked in the officer's direction then looked in the direction of the main entrance of the building "and made a negative shake of his head and a motion with his hand. . . . Shaking his head from side to side in a negative manner while looking in the direction of the doorway of this building, then made this hand motion in the negative manner.'' (Swinging his hand from side to side with the palm up towards the entrance of the building).

After about two minutes, defendant drove the automobile toward the officer at a slow rate of speed. The officer was about 30 to 40 feet from the automobile when it started to move. Defendant was about 25 or 30 feet away from the entrance when the officer told him to stop the automobile. The officer directed defendant to get out of the automobile on the passenger side, which he did.

The officer instructed defendant to open the trunk of the automobile. Defendant walked to the rear of the automobile, took a key from among the keys on his key ring and opened the trunk. This was after some urging by the officer and after trying several keys.

When the trunk of the automobile was finally opened the officer observed the coats therein.

Concerning what thereafter transpired, the officer testified, ''I looked at the defendant. The defendant looked at me. I looked at the defendant. The defendant looked at me. I didn't say anything. And the first words he said to me— he spread his hands with the palms open, up like this, and he says, 'Well, you have got me.' He says, 'let's go.' ''

While walking the defendant toward the sidewalk the officer inquired. ''Who is your buddy up in the building?'' to which the former replied, ''I wouldn't give you the time of day.''

Shortly thereafter, the officer observed the person who had put the coats into defendant's car running very fast out the small door farthest from the officer and defendant towards an alley, headed west on 11th Street. The officer and defendant were about 25 or 30 feet east of the main entrance of the building. The officer put further questions to defendant as to who this individual was but could get no answer.

At the request of the officer, a passing pedestrian put in a telephone call for ''help,'' resulting in the arrival of other officers and the aforesaid Mr. Rubin. The latter accompanied the police up to the premises of the manufacturing company. The double door that opened into the premises had been tampered with. ''The door was slammed through. The two Yale locks were snapped. It was pushed in. The double-bar lock was broken and hanging to one side of the door with part of the jamb from the other side of the door hanging to the lock.''

An inventory taken on the following morning disclosed that 14 coats were missing from the premises. At the trial Mr. Rubin identified a coat found in defendant's automobile as one of the missing articles of merchandise.

Sworn as a witness in his own behalf, defendant testified that on the day in question he stopped at a market to get some cigarettes. That when he returned to his automobile he was accosted by a man whom he had previously seen and spoken to in that neighborhood but whose name he did not know. That when the latter asked defendant to drive him ''down town'' and that he would ''give you (defendant) a couple of bucks to get you some gas,'' the defendant agreed to do so. That his passenger directed him to a location and asked him to ''wait a minute'' across the street from 224 East 11th Street. Defendant testified that he saw the police officer standing in a filling station on the corner of 11th and Santee Streets as he approached the place where his passenger directed him to stop. That the man left the automobile, walked into the building and after five or ten minutes emerged therefrom with an armful of coats. That this man asked him to open the automobile trunk, which he did, and the coats were deposited therein. That the man asked him to turn his automobile around and stop in front of the building because there were

a few more pieces to get and then they would leave. Defendant testified that he made the U-turn when he observed the officer approaching; that his automobile "may have crept towards" the officer because defendant had released pressure on the brakes. That the officer approached the automobile, "stuck his head in the door, saying, 'I got you.'" That the officer directed him to open the trunk of the automobile, that one of the coats must have been caught in the lock inasmuch as defendant had to twist the key continuously to get the lock open. Defendant testified that he was apprehensive lest the officer might harm him because of the delay in getting the trunk lock open. That he asked the officer to wait a minute and the latter said he had defendant "with the goods." Defendant denied he made any signals with his hands but that he held them "straight up," palms open, because he feared the officer might shoot him. That the officer asked him who his "buddy" was in the building. That he replied he did not know the person's name and inquired of the officer why the latter did not wait there and intercept him. That the officer said, "You don't know a damn thing. You don't even know the time of day." On cross-examination defendant denied that the person he transported in his automobile said to him, "Do you want to make a fast buck?" but said only, "I will give you a couple of bucks to get you some gas." However, on recross-examination defendant admitted he had a conversation with Officer Billingsley on November 5th, and when asked whether, in that conversation, he did not state that the man he picked up asked him, "if you cared to make a fast buck," replied, "No. I don't think I did, because I was frightened. I don't know. I may have." Officer Billingsley, however, testified positively on rebuttal, that in the aforesaid conversation, defendant told him, "that the person he picked up at Central and Adams asked him if he wanted to make a fast buck."

The principal attack upon the judgment of conviction herein is that the evidence is insufficient to support the verdict. In that regard appellant asserts that "there is not one scintilla of evidence in the record to indicate a conspiracy or knowledge on the part of the appellant of the unlawful intent of suspect number two."

Undoubtedly, it is the law that before one can be stigmatized as an abettor he must have instigated or advised the commission of the crime, or have been present for the purpose of assisting in its consummation. In the instant case

we are satisfied that the facts therein proven require that the order appealed from be affirmed. It was the province of the jury to declare appellant's guilt or innocence, and unless we can say that it clearly appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below, the verdict of the jury, which has been approved by the trial court, cannot be set aside upon the ground "of insufficiency of the evidence."

And, if the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing tribunal that those circumstances might also reasonably be reconciled with the innocence of the accused will not warrant interference with the determination of the duly constituted arbiters of the facts.

Bearing these well established rules in mind, we are here confronted with the following incriminatory circumstances.

(1) Possession by defendant of the stolen property;

(2) Defendant assisting the thief on the latter's emergence from the building where the theft was committed, in placing the property in defendant's automobile, which was done hastily; then defendant driving his automobile nearer the building after the thief ran back in;

(3) Defendant looking in the direction of Officer Sandlin when the latter started toward where defendant was parked, then defendant looking in the direction of the main entrance of the building which the thief had reentered and making "negative" signs with his head and hand;

(4) Defendant's automobile starting in motion thereafter;

(5) Defendant's hesitancy in picking out the key to and opening the trunk of his automobile at the officer's direction;

(6) Defendant's admission to the officer, after he had opened the trunk which contained the stolen property, "Well, you have got me," and his statement "Let's go," in conjunction with spreading his hands with the palms open.

The law makes no distinction between direct and circumstantial evidence in the degree of proof required. It requires only that evidence of the one character or the other or both be sufficient to establish guilt beyond a reasonable doubt in the minds of those bound to act conscientiously upon it.

Appellant insists that there was no motive for the theft. That "Appellant had in his possession at the time of his apprehension some $5,000.00 worth of tangible assets, and

had a job paying $70.00 per week, not to mention an outside source of income. Obviously, the purpose of theft is to acquire money, and yet on the meager amount of evidence available, the jury found that a man in the financial position of the appellant would commit burglary for some $294.00 worth of coats.''

However, when it is remembered that an inference is founded upon such a deduction from a fact legally proven ''as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business or the course of nature'' (Code Civ. Proc., § 1960), it is difficult to understand how a person financially situated as appellant was would be interested in driving a practical stranger from Adams Boulevard and Central Avenue to downtown Los Angeles to obtain for himself ''a couple of bucks to buy gasoline.'' The very circumstances adverted to by appellant impress us that the jury was justified in concluding that his testimony lacked the essence of verity, and that he was a knowing and willing participant in the crime charged.

Finally, appellant complains that the court erred to his prejudice in excluding testimony of the entire conversation had with Officer Billingsley, and, as to a portion of which the officer testified on his direct examination.

In that regard the record reflects that on rebuttal, the officer testified:

''Q. Did you have a conversation with the defendant on the night of May 5, 1952, at the City Hall in the presence of a couple of other officers? A. I did.

''Q. In that conversation did the defendant tell you that the person he picked up at Central and Adams asked him if he wanted to make a fast buck? A. He did.''

On cross-examination the following occurred:

''Q. By MR. DRABIN (Appellant's counsel): Officer Billingsley, what else did he tell you at that time?

''MR. DONNELLAN (Deputy District Attorney): Objected to as not cross-examination.

''THE COURT: It calls for hearsay. Sustained.

''Q. By MR. DRABIN: Officer, did you ask him at that time whether or not he had stolen these coats?

''MR. DONNELLAN: Objection. Improper cross-examination.

''THE COURT: Objection sustained. It calls for hearsay, a self-serving declaration. Sustained. The only question is whether he did or did not make that particular statement.''

On direct examination appellant testified that the person he drove to the scene of the burglary had stated he would give him, ''a couple of bucks to get gas.'' On cross-examination appellant denied that this person asked him if he ''wanted to make a fast buck.'' And, on recross-examination appellant testified he did not think he made a statement to Officer Billingsley that his passenger had asked him if he ''wanted to make a fast buck.''

In support of the proposition that when part of a conversation is admitted in evidence the opposing party may have the entire conversation admitted, appellant relies upon section 1854 of the Code of Civil Procedure; *People* v. *Connelly*, 195 Cal. 584, 596 [234 P. 374], and *People* v. *Brac*, 73 Cal.App.2d 629, 638 [167 P.2d 535]. However, the cited cases go no farther than to hold that when one part of a subject matter is brought out by a party it is proper for the opposing party to bring out all that was said on the subject. █ In other words, the rule that where part of a conversation has been shown in evidence, the remainder of that conversation may be brought out by the opposing party, is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items or subject matter thereof which have been introduced. In the instant case it was not shown that disclosure of the entire conversation would have any bearing on the limited point of challenge of appellant's credibility (*People* v. *Horowitz*, 70 Cal.App.2d 675, 691 [161 P.2d 833]). As cogently stated by the trial court, ''The only question is whether he (the witness) did or did not make that particular statement.''

We are satisfied that the trial judge did not err or abuse the discretion vested in him in limiting the cross-examination as he did.

For the foregoing reasons the order denying defendant's motion for a new trial from which this appeal was taken, is affirmed.

Doran, J., concurred.