[Crim. No. 4959. Third Dist. May 8, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. WILBUR H. STUART et al., Defendants and Appellants.

Jerry Guthrie, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendants Stuart and Baldwin were charged in two counts: (1) violation of Penal Code section 459 (burglary) and (2) violation of Penal Code section 496 (receiving stolen property). (Another count for assualt had been dismissed before trial.) After a court trial they were found not guilty of burglary, guilty of receiving stolen property. They appeal.

There was substantial proof that four radios had been stolen. Later two of them were found in the locked trunk compartment of an automobile which defendant Stuart had been driving. Thereafter the other two were found in a motel room occupied by the defendant Baldwin.

 Possession of stolen property alone is not sufficient to support a Penal Code section 496 conviction. Knowledge by a defendant that the property has been stolen is a necessary element of the crime to be proved by the prosecution. Here the prosecution sought to establish Stuart's knowledge by proving flight. Baldwin's knowledge was sought to be proved by introducing an extrajudicial statement made by that defendant to a police officer. Evidence adduced at the trial relating to the flight and statement respectively might be said to justify inferences of knowledge. But that evidence was fragmentary. Evidence known to the prosecution was withheld from the trial judge. That withheld evidence had been produced at a suppression hearing held before trial under Penal Code section 1538.5. That hearing had been before a judge other than the judge who presided at the trial. An order was made denying the motion to supress the evidence and authorizing admission of the allegedly illegally seized evidence (the four radios). We denied the petition to review that order. The relevancy of the order and our action to the present appeal lies in the fact that it explains our knowledge of the evidence taken at the suppression hearing. We have caused the augmentation of the record on appeal to include the transcript of the suppression hearing.

When the evidence at that hearing is put together with the evidence at the trial a startling revelation occurs. The inferences created by the evidence at the trial become changed and distorted. Although the same principal witnesses testified both at the hearing and at the trial the evidence elicited and obtained from these witnesses was vastly different. Examination of the whole record compels our conclusion that distortion was deliberate. The fact that defense counsel knew that evidence was being withheld and did not object does not change the action demanded of us in the interest of justice. Even our assumption of the additional possibility that defense counsel may have withheld objection for tactical purposes could not affect the ultimate result. The reason: a criminal action was presented to a trier of fact upon partial evidence which, by reason of the false inferences created, became false evidence. A case so tried is an unfair trial which

denies the accused due process. We cannot accept a postulation that a trier of fact might have deemed the true evidence more inculpatory than the false. A trial upon false evidence is no trial at all.

The significance of the disparity between the evidence at the suppression hearing and that presented at trial rests upon an understanding of relatively simple principles of law.

### The Legal Issues

The elements of the offense of receiving stolen property are (1) that the property has been stolen; (2) that the accused received, concealed or withheld it from its owner; and (3) that the accused knew the property was stolen. (*People* v. *Siegfried* (1967) 249 Cal.App.2d 489, 493 [57 Cal.Rptr. 423].) No distinction is made between direct and circumstantial evidence in the degree of proof required. That inferences consistent with innocence as well as guilt may be drawn from circumstantial evidence is not controlling—after the case has reached a reviewing court. (*People* v. *Hymer* (1953) 118 Cal.App.2d 28, 33 [257 P.2d 63].) "Possession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt. [Citations]." (*People* v. *McFarland* (1962) 58 Cal.2d 748, 754 [26 Cal. Rptr. 473, 376 P.2d 449].)

"Acts of an accused, designed to prevent arrest, may afford an inference of consciousness of guilt, and are receivable against him as implied admissions. [Citations.]" (Witkin, Cal. Evidence (2d ed. 1966) § 511, p. 481.)

### Undisputed Facts

Proof that the goods were stolen was conclusive. The evidence was untainted. On January 22, 1968, the offices of the business premises of W. K. Ingram, Inc. in Oroville were locked up at the close of business. That evening it was discovered that thereafter an unlawful entry had been made, desks and cabinets had been ransacked, and several items which had been there earlier had been removed. Among those items were four walkie-talkie radios. These belonged to Ingram.[1]

---

[1] It is contended that the fact of ownership was proved only by the hearsay testimony of Ingram's secretary. She also testified no one had been given permission to remove them. In the absence of objection, hearsay evidence will support a conviction. (*People* v. *Garcia* (1957) 151 Cal. App.2d 196, 199 [311 P.2d 45] (hear. den.).)

### *The Evidence of Stuart's Guilt*
### *Before the Trial Court*

The only evidence received at the trial to prove Stuart's possession of stolen goods or his knowledge of the fact that the goods were stolen was the testimony of Oroville Police Officer McElhaney. He testified that at approximately 2:10 a.m. on January 28, 1968, he had seen Stuart driving a Buick automobile on a main street of Oroville. The officer flashed his red light, signalling for Stuart to stop. He did not mention why he was trying to stop him. He did say that he had recognized Stuart whom he had met on a prior occasion. Stuart, instead of stopping, took off at a high rate of speed. McElhaney pursued. During the chase the officer lost sight of the Buick as it went over a rise in the road. When it was next seen it had been abandoned. McElhaney did not try to fiind Stuart. Instead, according to his testimony, he searched the automobile. The keys had been left in the ignition switch. He used them to open the trunk. There he found two radios which were shown to be two of the four radios which had been stolen. Stuart was not apprehended until some days later. That was the sole case against Stuart.

### *The Evidence of Baldwin's Guilt*
### *Before the Trial Court*

On the afternoon or early evening of February 5, 1968, Lieutenant Spinale of the Oroville Police Department went to defendant Baldwin's room at the Thunderbird Lodge in Chico. Chico police officers were already present when Spinale arrived. Their presence there was not explained. The door to the motel room was open. Spinale entered and placed Baldwin under arrest. An adequate warning required under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1502, 10 A.L.R.3d 974] was given. Baldwin waived his right to an attorney and talked. He then stated to Spinale: ''That if I would wait until Stuart is picked up that he would get it clarified so no other persons are involved except the two.'' A search of the room disclosed two radios. These were proved to be the two other stolen radios.

Neither Stuart nor Baldwin testified at the trial.

### *Inferences to be Drawn From the*
### *Evidence at the Trial*

As regards Stuart the only possible inference permissible which would connect him with knowledge of the fact that the radios found in the trunk of the Buick were stolen is his flight

when Officer McElhaney had flashed a red signal commanding him to stop.

Penal Code section 1127c provides that in a jury trial the court must instruct the jury that flight of a person *immediately* after the commission of a crime is a fact which, while not sufficient in itself to establish his guilt, is one which, if proved, the jury may consider in deciding his guilt. When the court is the trier of fact the reasoning of the legislative mandate would still apply.

It was stated in *People* v. *Hill* (1967) 67 Cal.2d 105, 120-121 [60 Cal.Rptr. 234, 429 P.2d 586], that the purpose of the enactment of section 1127c was to abolish an earlier rule that flight could not be regarded as evidence of guilt "unless it had been proved that the fleeing suspect had previously learned that he was accused of commission of a particular crime. [Citations.]"[2]

We have shown that possession of stolen goods alone will not support a conviction. The whole case of the prosecution against Stuart depended upon the theory that his flight was to evade apprehension while the stolen radios were in his possession and thus consciousness of guilt was shown. That, in fact, is the sole argument of the Attorney General on appeal to support proof of knowledge by Stuart of the fact that the radios were stolen. If it had appeared that Stuart had been seeking to evade the police for another reason the probative value of the evidence of flight would have vanished.

The whole case of the prosecution against Baldwin hinged upon interpreting his extrajudicial statement as relating to the crime of receiving stolen goods. The trial judge was being led to infer that when Baldwin said Stuart would "clarify" the matter, showing that he and Baldwin were the only two involved, Baldwin was referring to the stolen radios.[3]

---

[2]The code section refers to flight "immediately" after the commission of a crime. The burglary occurred January 22, 1968. This "flight" was six days later on January 28, 1968.

The Attorney General urges that since the withholding of stolen goods is a continuing crime "immediately" should not be correlated to the date when the accused may have first received the property.

For the purposes of this opinion we may assume without deciding that the contention of the Attorney General is correct.

[3]Officer Spinale was never asked by the prosecuting attorney for what crime he was arresting Baldwin. He was not asked why he was questioning him. There was testimony: "Q. Now calling your attention to the 5th [i.e. February 5th when the arrest was made] did Mr. Baldwin make any statements about talking to you about the radios and the incident? A. He made a statement to me in regard to the whole incident. . . ." We shall see that this statement, read in the light of *all* the facts is vague and equivocal.

Both Stuart and Baldwin were convicted upon the foregoing evidence. We now relate the facts withheld.

### Evidence at the Suppression Hearing

Penal Code section 1538.5 insofar as it applies here provides for a hearing before trial of a motion to suppress evidence based upon the ground that the evidence was seized illegally. The section states that the judge ''shall receive evidence on any issue of fact necessary to determine the motion.'' (§ 1538.5, subd. (c).) Subdivision (i) provides for a review after an adverse ruling by a petition for a writ of mandate or prohibition to an appellate court. Defendants by a motion under section 1538.5 sought to exclude the four radios (seized under the circumstances we have described) from admission into evidence. A judge other than the trial judge held a hearing. The transcript of that hearing is materially longer than the trial transcript. The court denied the motion. This court denied defendants' petition for a writ. At the trial the court admitted the proffered evidence over objection and without foundational proof. Evidence at the suppression hearing showed the following:

On the night of January 28, 1968 (six days after the burglary) an assault is said to have been committed in Oroville upon one or more persons. The actual assailant was declared to have been a person later identified as Baldwin. He had been armed with a sawed-off shotgun. He had escaped in a 1963 Buick automobile driven by another. Officer McElhaney had been apprised of the assault. He was on the lookout for the Buick which had been described to him. When he spotted the car answering that description he flashed his red light. The place where the officer first saw the car was on a street other than the intersection where he said he had first observed it when he testified at the trial. There were two occupants. Stuart was driving. McElhaney described the chase.[4] At the end of the chase the officer directed his attention to the aban-

---

[4]His account tests one's credulity. He said that during the chase the speed of the pursued and pursuing vehicle reached 110 miles per hour. The chase lasted over a considerable distance during which the Buick changed directions several times and led McElhaney along a number of streets and roads. Yet the officer had the other car in sight at all times except for from 5 to 10 seconds when it went over a rise in the road. During that brief interval many things happened: the Buick skidded off the road into a cow-pasture fence. There it became tangled up in 40 feet of hog wire and barbed wire. (At the trial the officer testified it had become ''disabled'' when it attempted to turn into a driveway.) The area around the disabled vehicle was open for a radius of 40 to 50 yards. Yet the occupants of the Buick had disappeared.

doned Buick. He was not looking for stolen radios. (There is no evidence in the record that either Stuart or Baldwin were, at the time, even suspected of having had any connection with stolen radios.) The officer was looking for the sawed-off shotgun which he thought might have been left in the car. The search of the trunk was for this gun. He didn't find it. At the suppression hearing the evidence is vague as to how and where the radios were discovered. The inference is strongest that two radios were found during an inventory-taking process at a garage where the Buick was taken to be impounded. It was discovered that Stuart was not the registered owner of the car. It belonged to one Emery Lee Downs. It was never explained how Stuart happened to be driving the car.

We turn to the events at the motel as described by the officers called as witnesses at the suppression hearing.

Stuart had been identified as the driver of the Buick. The Oroville police had a description of the assailant at the asserted assault committed January 28th. Stuart's son, interviewed by the police when he had brought in a shotgun had stated it had been found at a place indicated by a man known to him only as "Ed." Young Stuart told the officers that the man and his father had been together on the evening of the 28th. Further police investigation revealed that an "Ed Baldwin" was a known acquaintance of Stuart. The description of Baldwin received from law enforcement agencies fit the description of the assailant. It had been learned that Baldwin drove a two-toned Hillman automobile.

Meanwhile, independent of the foregoing investigation, the manager of the Thunderbird Lodge at Chico had requested police investigation of a Hillman automobile which had been left in the motel parking lot for several days. Two local police officers called at the motel. They found Baldwin re-registering. He had stayed there a few days before. Both times he registered under an assumed name. He denied ownership of the Hillman. The officers testified that Baldwin consented to their accompanying him to his motel room. A young woman was in the room. A search was made of the motel room. At the time Baldwin's suitcase was not included in the search. One of the officers (Horton) and the woman left. The officer returned to the Chico police station where he chanced to meet Officer Spinale. Horton described the incidents at the motel to Spinale. The two then went to the motel and Spinale made the arrest which he testified to at the trial. At the hearing he stated that the arrest, made immediately upon arrival at the room, was for the assault, for burglary, for receiving stolen

property and for possession of a sawed-off shotgun. All of the evidence we have related is based upon the testimony of the officers. Baldwin, a witness at the hearing, gave testimony sharply conflicting with that given by the officers. The officers' testimony is not wholly consistent. That is particularly true of the testimony of Officer Spinale. For example, at the hearing Spinale testified that after the arrest and after the warning given he had searched the suitcase and had found two radios therein which he had tagged. He was explicit about this. At the trial he changed his testimony. After it had been pointed out to him that no mention was made in his report of any radios (although every other item found in the suitcase, including two pistols, had been inventoried), he stated that one of the radios had been found in the suitcase but the other had been found elsewhere in the room—he could not recall where.

### *In Summary*

 Thus at the *hearing* the flight in the Buick which, at the trial had appeared to be a flight by Stuart to avoid being caught with stolen goods, becomes a flight by two persons from the scene of an alleged assault. (We say an "alleged" assault because the charge was later dropped.)

Even doubt is cast upon the status of Stuart as a possessor of stolen goods. The two radios were found in a locked compartment of a car owned by another person. That person, Mr. Downs, was not a witness and we have not yet been informed whether Stuart's possession of the car was with or without permission, brief or protracted.

As to the guilt of Baldwin, the extrajudicial statement which, at the trial, seemed to permit no inference other than his connection with the offense of receiving stolen goods becomes, through the evidence at the hearing, considerably clouded. It may have referred to that crime; it could just as readily have been related to the unproved assault, or to other misdeeds regarding which (so the officer stated) Baldwin was a suspect. Moreover, Baldwin's statement implies the possible involvement of a third person. And in the context of the presence of a young woman in Baldwin's room perhaps a new implication must be read into the statement that Baldwin sought to exculpate her.

It must be noted that the statement could not legally be

used to inculpate Stuart. (*People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265].)[5]

Finally when the trial transcript and the hearing transcript are read together the vulnerability of the two principal officer-witnesses of the prosecution to an attack upon their credibility comes sharply into focus. The discrepancies in their testimony between hearing and trial have been noted above and need not be repeated.

### *Legality of Search Versus Admissibility of Evidence; Burden of Proof*

The case must be reversed for retrial. That necessitates brief guideline comments to the end that error not commented on above will not be repeated. (The error was that of the prosecutor, not of the court.) ▮ When evidence is indispensable to two or more issues in a single prosecution those issues cannot be separated in such a manner that the evidence is heard and evaluated only with respect to one of such issues. Here even had one judge heard both the section 1538.5 motion and presided at the trial that would be true. The reason it is true may be illustrated by the facts here. The section 1538.5 proceedings decided but one issue: the validity of the challenged searches against a Fourth Amendment attack. No other issue was resolved. The hearing did not resolve either the question of the admissibility or of the weight of the evidence received at the suppression hearing to prove any other issue of the case.

Further, throughout the suppression hearing the prosecution repeatedly insisted that defendants had the burden to prove that the searches were illegal. (Apparently his theory was that that was so because defendants were the moving parties and moving parties usually have that burden.) But these searches were made without any warrant. ▮ No rule is better settled than that the burden of proof of the legality of a warrantless search is upon the prosecution. (*People* v. *Marshall* (1968) 69 Cal.2d 51, 56 [69 Cal.Rptr. 585, 442

[5]Yet that is what the prosecutor in this case deliberately essayed to do. The attempt evoked a motion for a mistrial. The trial judge, aware of the error, nevertheless denied the motion upon the ground that he, in a court-tried case, could disregard the reference to Stuart. We do not doubt that he did so. *Aranda* error is not necessarily prejudicial. (*People* v. *Flores* (1968) 68 Cal.2d 563, 567-568 [68 Cal.Rptr. 161, 440 P.2d 233].) We point out, however, that a deliberate repetition on a retrial of this case could not be tolerated. These defendants, therefore, would either have to be separately tried or the complete statement excised. The statement, in its very nature, is incapable of prophylactic deletion.

P.2d 665].) The fact that the Legislature has devised new procedures intended to expedite determination of the question of legality of searches does not shift the burden of proof.

The judgment against each defendant is reversed.

Friedman, J., and Janes, J., concurred.